CECELIA J. O'CONNOR v. PILLSBURY FLOUR MILLS COMPANY.[1]

June 19, 1936.

No. 30,831.

*Bowen, Best, Flanagan & Rogers* and *Thomas H. McMeekin,* for appellant.
*Snyder, Gale & Richards,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff recovered a verdict of $18,000 against defendant in her action for damages founded upon the claim that she became afflicted with pulmonary tuberculosis while employed in one of its mills in Minneapolis, the basis for liability being the alleged violation of

[1]Reported in 267 N. W. 507.

1 Mason Minn. St. 1927, §§ 4172, 4173, 4174, and 4176. These sections relate to heating and ventilating places of employment. Defendant's motion for judgment notwithstanding was granted. Judgment was thereupon entered, and plaintiff appeals.

Her employment with defendant commenced in September, 1927. Before being engaged as an employe she was examined by defendant's physician and was found to be free from communicable disease, including tuberculosis. The nature of her work was to pack flour into two- and five-pound bags. It required three girls to perform this work. They changed with each other at frequent intervals as to the kind of work they were doing—packing, weighing, and sewing or otherwise closing the bags. Plaintiff continued in her employment until February, 1930, when it was found that she was suffering with pulmonary tuberculosis. Since then she has been under medical treatment. While her condition is somewhat improved, the evidence leaves no room for doubt that she is far from well. Her case is classified as being "improved." This the court found "represents a mid-stage of the disease."

In a memorandum of the most searching, helpful, and convincing type, attached to the order granting judgment, the court fully covered what it concluded to be the determinative defects in plaintiff's case. We shall not attempt to include the entire memorandum, covering as it does seven pages of printed matter. The following will suffice:

"It is admitted by the medical experts on both sides that no one can tell when or where the germ that resulted in the disease found lodgment in the body, and their opinions seem to justify the truth in the wording of a current poster of a tuberculosis organization, 'Anybody, any time, anywhere, may contract tuberculosis.'

"There was much flour dust in the room where plaintiff did her work. It was not always heated or ventilated to her satisfaction.

"The experts all classified flour dust as one of the so-called 'harmless dusts,' and even included in such classifications the dust found in coal mines, their line of demarcation between 'harmful' and 'harmless' dusts being that drawn between 'organic' and 'in-

organic' dusts. *The available records of this locality show that the incidence of tuberculosis is much less among flour mill workers than in the general public.* Plaintiff challenges the reliability of those records, but produces no others.

"Plaintiff's sister began work in the same place and worked there five years. She is not now afflicted with tuberculosis, though she had worked in the same place and worked there twice as long, and in fact slept with plaintiff until the latter was discovered to have the disease.

"There is no record of any other workers in the place having contracted the disease, though some of them worked there many times as long as the plaintiff. The evidence fails utterly to indicate that tuberculosis is a disease occupational to the flour milling industry. * * *

"At the trial eight women or girls who worked in the same environment with the plaintiff, ranging in periods of time from two to twelve years, testified, some of them for the plaintiff, some of them for the defendant. The inference is that the other employes making up the full force at any particular time was composed of more short-time workers, and no evidence has been produced with respect to them. Outside of plaintiff, none of the workers in that work and in the rooms they used contracted tuberculosis since 1921. * * *

"In the main packing room of the defendant, where men are employed and larger sacks filled, 30 per cent of the men had been there between 15 and 19 years, 40 per cent had been there over 20 years, 94 per cent had been there over 10 years. No packer employed there has died of tuberculosis since 1920, and there have been but 7 cases of determined tuberculosis since 1921. * * *

"It is the opinion of one medical expert called by the plaintiff that her tuberculosis is chargeable to the condition of the flour existing in the air in the place in which she worked, of improper and inadequate heating and ventilation. The fair import of all of the medical testimony is that one may be harboring the germs of tuberculosis in his system unknown to himself, unless he submit himself to certain medical tests which do reveal the presence of the

germ. And one may be in an apparently healthy condition and still have the germs in his system.  *  *  *

"It may be possible that conditions existing in the place where she worked did cause a development of the disease with which she is afflicted. But what shall we say of her sister, who worked beside her, and twice as long, who slept with her, and yet who did not contract the disease? What shall we say of the other workers, her companions, who worked in the same environment, some of them many times as long as she did, and who did not contract the disease? What shall we say of the lack of incidence of tuberculosis among workers, under the same environment? What shall we say of the well-known appearance of tuberculosis in such surroundings as preclude any element such as is claimed to be the cause of plaintiff's condition? What shall we say of the cold dwellings of innumerable families with which most of us have had our own personal experience, where the temperature drops far below that claimed here, before the stove or furnace is put into active operation in the morning? What shall we say of the thinly-clad young ladies who leave in a perspiring condition a warm ballroom to get a bit of fresh air in zero weather? Or of the school girls who breezily flit from one building to another to attend a class in our institutions of learning? What shall we say of all those passing ailments of life, the cause of which we know not, but which we do know sap our vitality and make us prey to the ravages of those harmful germs that the medical profession tells us are all about us and in our bodies? We cannot ignore the things that are constantly before us. *And in all the multiple environments of life, each freighted with the possibility that it may for the first time be the means of disturbing us to the point of lack of resistance, can we with any fair degree of certainty, years afterward, place our finger upon some one long-past incident and say, 'There, that is the time when my resistance was so lowered that the germs of disease were given an opportunity to multiply in my system.' To do so lies wholly in the field of conjecture.*

"Though giving full faith and credit to the plaintiff's testimony, nevertheless that faith and credit must be tempered somewhat by

her own admissions and retractions, as well as the conclusiveness of records that show she was at least mistaken. She must have been wrong when she and her witnesses placed almost as much flour on the floor to be wasted as they packed in the sacks. She was mistaken when she testified to a total of an average of nearly a third more hours than the records and checks which she got for her pay indicated. She was mistaken in the double shifts and overtime, as indicated in those same records. One may not be harsh with one so grievously afflicted, yet another cannot be burdened by that affliction, unless under the law it is shown that one so burdened is legally responsible. The evidence in this case, in the opinion of the Court, does not so show."

Plaintiff's entire cause hinges upon the testimony of one of her medical experts, Dr. Josewich, and his testimony has for its entire foundation the claimed facts set forth in a hypothetical question submitted by plaintiff's counsel. This question embraces 32 folios in the printed record and includes every favorable piece of evidence upon which plaintiff relied, and, as stated by the trial court, included much as to which plaintiff "was at least mistaken." Cross-examination brought out forcibly, and we think conclusively, the lack of adequate foundation for this expert's conclusion. Illustrative of the inconclusive basis for his opinion is the following brief excerpt:

Q. "You don't know whether the infection occurred a year before she left the employ or ten years before?

A. "I have not been able to trace it, I don't know.

Q. "Is there any evidence that the infection occurred at Pillsbury Mill, that you have heard in this case, that you have been asked to assume?

A. "No, there is none.

Q. "I take it, then, your assumption is that infection occurred elsewhere, but a lessened-resistance, due to conditions at the mill, favored the development of the germ?

A. "No, your assumption is not strictly correct. I don't know where she received her infection.

Q. "Well, you have not any justification for assuming it was received at the mill, have you?

A. "No.".

And there is much more of the same nature.

Two medical experts were called for plaintiff. Only one, Dr. Josewich, testified that plaintiff's condition was traceable to the working conditions in defendant's mill. Her other medical expert was her regular physician, who had treated her over a period of two and one-half years and under whose care she remained. He described her condition and his treatments and expressed the opinion "that with proper treatment she will continue to improve, continue to live more and more a normal life." When defendant on cross-examination attempted to go into the question of the cause of plaintiff's condition her counsel objected and refused to permit him to testify as to whether, in his opinion, plaintiff's working conditions had anything to do with her ailments.

Another thing important to note is the fact that the various physicians who had treated plaintiff for this ailment, both when she was at the sanitarium and thereafter, were not called in her behalf, nor was any explanation made of their absence. Plaintiff's only medical expert to support her theory of proximate cause did not even hear the evidence in the case. As has been said, his testimony hinges upon a long and involved hypothetical question including much as assumed truth that the trial court characterized as "at least mistaken." A careful reading of the record leads us to the same conclusion as that reached by the learned trial court, "that the evidence does not justify a verdict for the plaintiff for any amount, because its foundation is conjecture, to such an extent that it amounts to nothing more dignified than guesswork."

Upon plaintiff rested the duty of furnishing proof "affirmative of the issue." The cause of her tubercular condition was, as we have seen, "left in the realm of conjecture," and as such her cause fails. Phillips v. C. M. St. P. & P. R. Co. 182 Minn. 307, 310, 234 N. W. 307.

"The ordinary function of experts is to assist the jury, by their superior knowledge in reaching a correct conclusion from the facts

540

in evidence. Their opinions are not ordinarily conclusive upon the jury, but are mere items of evidence to be considered by the jury along with the other evidence in the case. * * * The supreme court is inclined to defer to the judgment of the trial court as to the weight that should be attached to the testimony of expert witnesses." 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 3334.

The Iowa court in Hall v. Rankin, 87 Iowa, 261, 264, 54 N. W. 217, 218, said:

"The sole value of the opinion [of an expert witness] must, of necessity, depend upon the correctness of the statement of facts upon which it is based. If that is incorrect, then the opinion can have no weight or value whatever."

See also Kirsher v. Kirsher, 120 Iowa, 337, 94 N. W. 846; Ingwersen v. Carr & Brannon, 180 Iowa, 988, 164 N. W. 217, and particularly that part of the opinion under the seventh syllabus paragraph in the Northwestern Reporter.

The supreme court of Wisconsin in Bucher v. Wisconsin Cent. Ry. Co. 139 Wis. 597, 608, 120 N. W. 518, 522, said:

"* * * obvious error of opinion, opinion based on insufficient data, or nonsense clothed in words of 'learned length,' may be disregarded by this court as a basis for supporting a verdict."

What has been said disposes of the case upon the merits. We think the present record will not sustain any recovery; hence the judgment appealed from must be and the same is affirmed.

Affirmed.