# CLARA ZAPPA v. CHARLES MANUFACTURING COMPANY AND ANOTHER.

## 109 N. W. (2d) 420.

### May 26, 1961—No. 38,253.

*D. L. Ballou,* for relators.
*Helgesen, Kane, Peterson & Engberg,* for respondent.

KNUTSON, JUSTICE.

Certiorari to review a decision of the Industrial Commission awarding compensation to the dependents of a deceased employee.

Deceased, Frank Zappa, had been employed by Charles Manufacturing Company for a number of years. On the afternoon of October 15, 1957, while working on an assembly line as a seatmaker, employee bumped his right hip against a wagon behind the bench on which the furniture on which he was working was located. He doubled up in pain and felt his back. He started to walk toward his toolbox but fell to his knees after walking about 3 feet. The foreman on the job was called, and employee was taken by car to Dr. Abraham B. Litman. He was complaining of his back and was somewhat bent over when he first appeared at the doctor's office. He was examined immediately. The doctor found no abrasions of any kind. He strapped employee's back and gave him some medicine for pain and advised him to go home and use heat treatment. Upon reaching his home, employee did not go to bed immediately but retired that evening. The following morning he was unable to get out of bed and was taken by ambulance to the hospital. There Dr. Litman put him in traction, and routine laboratory tests were performed and X-rays were taken of his spine. The findings were essentially normal.

Employee did not seem to improve, and on October 22, 1957, Dr. E. Harvey O'Phelan, an orthopedic surgeon, was called to examine him, and he diagnosed his condition as back strain with possible fracture of the vertebrae or a possible disc. The orthopedic surgeon suggested conservative treatment, but he recommended a spinogram if no improvement developed.

There was no improvement, and a spinogram was done on October

28 by the orthopedic surgeon. Five cc's of spinal fluid were removed, and the media or dye was run up to the twelfth dorsal vertebra, the needle being inserted between the fourth and fifth vertebrae. The laboratory reported that the spinal fluid was clear, and the spinogram was essentially normal, with a slight bulging at the fourth and fifth spaces. His condition was diagnosed as a mild positive disc or possibly just an arthritic spur, but it was the opinion of the surgeon that it was relatively mild and of no consequence.

The hospital records show that on October 31, 1957, employee appeared to be somewhat dizzy. Mrs. Zappa testified that following the spinogram employee fell while attempting to remove his robe; that his speech was slurred; and that he tended to mumble. Otherwise he progressed normally. A body cast was applied on November 1, 1957, and he was discharged in an improved condition on November 2. On November 5, 1957, he reported to Dr. Litman's office and stated that he was feeling good. On November 8, he exhibited a paralysis of the right side of the face; on November 15 he was again in Dr. Litman's office and exhibited paralysis of the face and reported spells of twitching, his left hand being weak, and he showed definite signs of paralysis of the entire left side. Dr. Litman advised hospitalization, and he was again hospitalized on November 20, 1957.

Dr. Robert C. Stoltz, a neurologist, was called in at that time, and he suggested an electroencephalogram, skull X-ray, and a spinal tap. Two spinal taps and the electroencephalogram were performed, and a neurosurgeon, Dr. Paul Blake, was called in to perform an angiogram. The angiogram was given November 29, 1957, and indicated a mass lesion in the right frontal parietal region. It was decided that this should be explored surgically, and on December 2 the surgeon removed a secondary metastatic lesion. The primary lesion was undetermined. Thereafter, complete X-rays were taken in an attempt to find the primary lesion but without success. Postoperatively, employee did very well and was sent home on December 21, 1957. Dr. Litman was called to the patient's home on January 10, 1958, at which time he had definite paralysis. He was transferred to a cancer home on February 8, 1958, and died of cancer on or about February 11, 1958.

It is the contention of petitioner that the spinogram performed on October 28, 1957, aggravated a preexisting brain tumor and was a contributing cause of employee's death.

Five doctors testified at the hearing. Drs. Litman and O'Phelan had no opinion as to whether the spinogram had any causal relationship to employee's death. Dr. Stoltz, the attending neurologist, and Dr. Harold F. Buckstein, called as an expert witness for relators, both testified that in their opinion the spinogram had no causal relationship to employee's death. Dr. Blake testified as follows:

"Q. Now, Doctor, from your treatment of the patient and from your examinations, if this man had been given a spinogram on the 28th of October do you have an opinion as to whether this would have affected the brain tumor?

"A. Yes, I do.

"Q. Can you tell us what that opinion is?

"A. Doing a spinal tap when the patient has a brain tumor can worsen the situation, change the dynamics inside the head, caused a shift of the tumor, which start a process of swelling in the tumor and around the tumor which can gradually lead the patient down hill.

"Q. Do you have an opinion as to whether that happened in this particular case?

"A. I can only judge from the history as given to me by the family that after the man left the hospital and after he had the spinogram, that he had continuing headaches and had a continual slow downhill course at home. Going into this stupor and what I saw the first day I saw him, I would think that this was a gradual downhill course from that time.

"Q. Related to the spinogram?

"A. I would think so, yes.

"Q. In your opinion, Doctor, would the brain tumor have eventually caused death anyway?

"A. Yes, it would have.

"Q. Is there any way of saying when it would have happened in the absence of the spinogram?

"A. I think within the next few months it certainly would have

grown large enough to cause the same symptoms and findings that we saw in November.

"Q. He would have died the next few months anyway?

"A. Yes.

"Q. Am I correct it's your opinion that he would have died within the next few months anyway, but the spinogram, due to the effects on the brain tumor, caused the death earlier?

"A. *No, I don't think caused the death earlier.* I think it precipitated the symptoms that lead to the operation. And I think that because he was operated on it had temporary reduction in the pressure inside of his head. The tumor grew back and caused him his death at a later time. But the tumor would have grown larger until it of itself, without any spinogram, started this process.

"Q. Surely. So it is just a question of the spinogram having to do with affecting the death at an earlier time and related to the operation and all of the rest of the treatment?

"A. I think that it could hasten it, but not to a marked degree. Now, what I am saying is that the spinogram precipitated the surgery, whereas left alone he may have gone a couple of months before he —bad enough—before he had surgery." (Italics supplied.)

On cross-examination, he testified as follows:

"Q. Doctor, do you think that it's significant that the time element between the taking of a spinogram and the centers of a lesion appear— do you understand my question?

"A. Would you repeat it?

"Q. Is the time element between the spinogram performed and the symptoms which you were reciting appear, is the time element in any way significant?

"A. Yes, I think it's of significance.

"Q. In your opinion, Doctor, what would this time element be?

"A. Well, I think the man could have a spinogram or spinal tap and be perfectly well after this for a period of months or years and then comes up with a brain tumor why there is no relationship at all. In other words, what I am saying is that the symptoms—*that the symptoms have to start within a very short time; within a period of a*

*day or so after the spinal tap*. I don't mean he has to go into a coma the day after the spinal tap, he has to have his disability and start his downhill course from about that time.

"Q. In a period of a day?

"A. A day or two, I think we could be in error in the symptoms that much.

"Q. If most of the time element was in excess of a day or two, would you rule out the casual [sic] factor of the spinogram?

"A. Well, then it becomes less likely.

"Q. Well, how about three days, Doctor?

"A. Well, I think three days is—I mean, I think we are splitting hairs when we—if you are talking about the difference of one day and two days.

"Q. Would you say a week, Doctor? Would you rule it out?

"A. I think a week would start to rule it out if the patient didn't have symptoms starting before that time.

"Q. In other words, if he didn't exhibit any symptoms?

"A. I mean a headache or stiff neck or discomfort of some sort he would have to start on. I would think within a week or so before. We can go out on a limb and say the spinalgram had influenced the course the tumor was developing.

"Q. Then, you feel that if his symptoms were not obvious within a week, then you definitely eliminate the possibility of the spinogram aggravating this pre-existing condition?

"A. *I think if he isn't complaining or if there isn't something about him within a week following the spinogram, I think you can rule the spinogram out.*

"Q. Well, Doctor, assuming that there was a delay of a week or ten days, could you explain the reason for this delay? I mean, why wouldn't it be immediate, is essentially what I am saying?

"A. Well, as I explained to you before, we are starting up a cycle of vicious impulses; vicious cycle going on around the brain, and I would think within a week after the spinogram this procedure would have advanced far enough to be giving him symptoms." (Italics supplied.)

The referee before whom the hearing was held found that there was no causal relationship between the spinogram and employee's death. On appeal, the Industrial Commission reversed, finding that there was such causal relationship, and awarded compensation.

■ It is well settled that an injury arising out of and in the course of employment which aggravates an existing infirmity is compensable even though the injury would have caused no disability to a normal person.[1]

■ The same is true where death is accelerated by an aggravation of an existing infirmity as the result of an injury arising out of and in the course of employment or by medical treatment necessitated by such injury.[2]

In Tillman v. Stanley Iron Works, 222 Minn. 421, 426, 24 N. W. (2d) 903, 905, this rule is stated as follows:

"Even though an employe is afflicted with a disease which would eventually result in his death, that does not bar his dependents from the right to recover for his death if he suffered an accident which arose out of and in the course of his employment, and this is so even if such accident intensified or aggravated his condition or affliction, *provided the accident was a contributing cause of his death.*" (Italics supplied.)

Before this rule can be applied, it must appear that the injury, or the medical treatment necessitated thereby, was a contributing cause of the employee's death.

■ Ordinarily, determination of causal relationship between an injury and the death or disability of an employee is a fact question, and where the evidence, including the medical testimony, is such that reasonable inferences may be drawn either way, the facts found by the Industrial Commission must stand.[3]

---

[1]Walker v. Minnesota Steel Co. 167 Minn. 475, 209 N. W. 635; Westereng v. City of Morris, 205 Minn. 219, 285 N. W. 717; Swanson v. American Hoist & Derrick Co. 214 Minn. 323, 8 N. W. (2d) 24; Erickson v. Knutson, 237 Minn. 187, 54 N. W. (2d) 118.

[2]Smith v. Mason Brothers Co. 174 Minn. 94, 218 N. W. 243; Jacobs v. Village of Buhl, 199 Minn. 572, 273 N. W. 245.

[3]Maher v. Duluth Yellow Cab Co. 172 Minn. 439, 215 N. W. 678;

■ In order that medical opinions may form a basis for an inference of fact, it must appear that the opinion is based on something more than mere conjecture. Inference must be distinguished from conjecture. An inference must rest upon proven facts or circumstances.

■ A medical opinion must also rest on a factual basis. In Hiber v. City of St. Paul, 219 Minn. 87, 91, 16 N. W. (2d) 878, 880, we said:

"* * * The rule against conjectural and speculative opinions is aimed at those not based upon a factual foundation and not at those which are. The distinction is between inference and conjecture. As Lord Shaw said in Kerr or Lendrum (Pauper) v. Ayr Steam Shipping Co. Ltd. [1915] A. C. 217, 233: 'The distinction [between an inference and a conjecture] is as broad as philosophy itself. It is that an inference rests upon premises of fact and a conjecture does not.' This distinction is fundamental in determining whether the opinion of an expert has evidentiary value. An opinion of a medical expert witness based upon an adequate factual foundation is not a conjecture, but a legitimate inference, and as such has evidentiary value in determining disputed questions of fact. * * * Where such an opinion is not based upon an adequate factual foundation, it has no evidentiary value and should be rejected."[4]

■ Petitioner's entire case here rests on the testimony of Dr. Blake. Of the other four doctors who testified, two had no opinion as to whether the spinogram had any causal relationship to employee's death; two testified definitely that it had no such connection. The three doctors who had an opinion, including Dr. Blake, conceded that if the spinogram had affected the existing brain tumor the symptoms showing such effect would have appeared within a short time. Even Dr. Blake admitted that unless some symptoms appeared within a week he would rule out the spinogram as having had any effect upon the development

State ex rel. Niessen v. District Court, 142 Minn. 335, 172 N. W. 133; Smith v. Mason Brothers Co. 174 Minn. 94, 218 N. W. 243; Swanson v. American Hoist & Derrick Co. 214 Minn. 323, 8 N. W. (2d) 24.

[4]Honer v. Nicholson, 198 Minn. 55, 268 N. W. 852; O'Connor v. Pillsbury Flour Mills Co. 197 Minn. 534, 267 N. W. 507.

of the tumor, which it is agreed ultimately caused death. The only evidence to substantiate appearance of any such symptoms even suggesting any aggravation of the brain tumor within the permissible time set by Dr. Blake was that of Mrs. Zappa that employee fell while attempting to remove his bathrobe and one entry in the hospital records that he appeared to have some dizziness. No attempt was made to establish that these occurrences resulted from the spinogram or that it had anything to do with it. Even Dr. Blake testified that the spinogram did not hasten employee's death. His testimony in that respect was as follows:

"Q. Am I correct it's your opinion that he would have died within the next few months anyway, but the spinogram, due to the effects on the brain tumor, caused the death earlier?

"A. No, I don't think caused the death earlier. I think it precipitated the symptoms that lead to the operation. And I think that because he was operated on it had temporary reduction in the pressure inside of his head. The tumor grew back and caused him his death at a later time. But the tumor would have grown larger until it of itself, without any spinogram, started this process."

From this testimony, about the best that can be said is that Dr. Blake was of the opinion that the spinogram may have accelerated discovery of a brain tumor and the following operation but that, even in the absence of the spinogram, death would have occurred at least as early as it did and possibly earlier if there had been no operation. Under this state of the evidence, an inference that the spinogram was a contributing cause of death is simply not justified. About all that can be said here is that the award is based on sympathy for the dependents rather than upon any legal or factual basis.

Reversed.