## JOSEPH WEBER AND ANOTHER, HEIRS OF HARVEY WEBER, DECEASED EMPLOYEE, v. PRINTING, INC., AND ANOTHER.

116 N. W. (2d) 569.

August 17, 1962—No. 38,568.

*Robb, Robb & Van Eps,* for relators.
*Minenko, Feinberg, Mirviss, Meyers & Schumacher,* for respondents.

---

Frank T. Gallagher, Justice.

Certiorari to review a decision of the Industrial Commission awarding benefits to the heirs of a deceased employee.

The decedent, Harvey Weber, a single man, had been employed since 1929 in the printing trade by Printing, Inc., and its predecessor. About noon on Monday, December 7, 1959, he fell while walking down an aisle in the employer's plant. Whether he tripped over something, or had a seizure as a result of excessive drinking, lack of food, and hypertension is in dispute.

In any event, he was admitted to a hospital about 12:30 p. m. that day, where it was noted on the nurse's notes, which were introduced in evidence, that he stated he fell at work and evidently hit his head. The notes show that he was bruised on the forehead, right eye, and right cheek; also that there was some bloody drainage from the right nostril, which apparently stopped that evening.

The doctor in charge of the patient called Dr. Andrew Leemhuis, a specialist in neurology and psychiatry, who saw Harvey that afternoon. Dr. Leemhuis testified that the history on the patient was that he had gone to the water cooler to get a drink of water after eating his lunch and that was the last thing he remembered until he was in an emergency room in the hospital. He said that Harvey gave a history of having had previous seizures in 1953 and 1954 and a blackout in 1958 or 1959; reported that there had been convulsions; and also gave a history of drinking anywhere from a "half pint to a pint a day and over the weekend consuming more; this particular weekend prior to the injury, he had a quart of bourbon and a case of six per cent beer; and he had 10 bottles of beer on Sunday and didn't sleep well Sunday night; he had no breakfast Monday morning except two cups of coffee."

The doctor further said that Harvey was "fairly good for a day or so" after entering the hospital. He then started to become restless and confused and went into delirium tremens and at one point it was necessary to put on restraints. By December 13, according to the doctor, Harvey was improving and continued to improve until December 19, on which date he was released from the hospital to go home at his own request. At that time his temperature was normal, his confusion gone, the swelling around his eye had practically dis-

appeared, and his condition was good in the opinion of the doctor. The diagnosis of Dr. Leemhuis as of December 19 was chronic alcoholism; epilepsy, possibly idiopathic or secondary to the alcoholism; hypertension; Grand Mal seizure; contusion, right forehead and cheek secondary to Grand Mal seizure; and D. T.'s, severe.

The testimony shows that after he got home the patient apparently felt well until December 21 or 22 when he began to show evidence of tiredness and lack of appetite. His brother, who lived in the same household with him, called the doctor. It appears the patient developed some confusion and headaches so he was again hospitalized on December 25. He was seen by Dr. Leemhuis, who said he was ataxic and confused. He had an elevated white blood count but his temperature was normal. On the morning of December 27 he went into a comatose state and showed many positive neurological signs for the first time.

Dr. Harold F. Buchstein, a neurologic surgeon, was called in on the case on December 27, 1959. He did a craniotomy on the right side of the patient's head. He said the brain was not abnormal in appearance and there was no evidence of blood or bruising in this area of the brain. Fluid was aspirated from the right lateral ventricle of the brain which appeared abnormal. On culture, these aspirated fluids showed pneumococci and a diagnosis of pneumococcic meningitis was made. Further X-rays were taken of the skull, which, according to Dr. Buchstein, were negative with respect to fractures to bone or other abnormalities. It was his opinion that the meningitis, because of the nature of the disease, must have developed after Harvey left the hospital on December 19. It was his further opinion that the pneumococci did not invade the brain through any portal of entry caused by the fall inasmuch as no evidence of any fracture appeared.

Dr. Leemhuis was of the opinion that the blow suffered by Harvey on December 7 had nothing to do with the infection and that the pneumococci probably got into the brain from the lungs. It was also his opinion that Harvey was beginning to get pneumonia when he was admitted the second time on December 25.

It appears the patient remained in a comatose state from December 27 until his death on June 14, 1960. By February 20, in the opinion

of Dr. Leemhuis, the cortex of the brain was essentially destroyed and he was existing on the brain stem. It was the doctor's further opinion after reviewing the post-mortem findings that the cause of death was meningitis.

On the date of death an autopsy was performed by Dr. Robert J. McClellan, a pathologist for Ancker Hospital, St. Paul, who had never seen decedent until that time. He testified in response to a hypothetical question that in his opinion the evidence of old injury found in the head would be compatible with the length of time between decedent's fall and his death. He was asked:

"Q. Now, Doctor, based upon the hypothetical question that you have been given and based upon your examinations, both grossly and microscopically, do you have an opinion as to the cause of death of this person on June 14th, 1960?

"A. Yes.

"Q. What is that opinion?

"A. That is that the basic cause of death was the old head injury. There were several other things which I believe entered into it.

"Q. Could you explain how these entered in, then, Doctor?

"A. Well, in the record I have listed as one of the findings bronchopneumonia, bilateral—I think that that certainly had something to do with his death, but as a complication."

Dr. V. Richard Zarling, a medical expert on the staff of the University Hospitals and other hospitals in Minneapolis, testified in behalf of the claimants. He had never seen decedent during his lifetime but based his opinion on the examination of the hospital records and on a lengthy hypothetical question. It was his opinion that decedent had a cerebral concussion and contusion at the time of his fall on December 7 and "in this fall suffered injury to the brain in the form of multiple small hemorrhages as manifests in the pathologic slide on the brain and also as a result of this developed a state of generalized susceptibility to infection."

Clarence Weber, decedent's brother, said he knew of no severe illness that Harvey had prior to December 7, 1959. He described

the drinking habits of his brother during the years. He said that he had used alcohol to some extent about 20 to 25 years. On the weekend before December 7, he told about having some strong beer at a family gathering when they were all drinking beer. He took Harvey to downtown St. Paul on the morning of December 7 but said he did not notice anything unusual about him.

Mr. Fred Wodke, with whom the employee rode to work on December 7 as on other occasions, testified that he picked him up with his car near the post office on Kellogg Boulevard at about 7:20 a. m. He was asked:

"Q. Did you notice anything unusual about him that morning?
"A. No, normal as he ever was."

Mr. Joseph A. Porter, an employee of Printing, Inc., said he talked with Harvey about 9:30 that morning and that he noticed "[n]othing whatsoever" unusual about him. Mr. Porter described the employee's fall as "sudden." He further referred to it as follows:

"* * * Harvey came down, hit the right side of his face on each of these slides, it spun him as it happened, the rubber mat having been pulled away, I should judge, a foot or say a foot and a half away from that stone where the man stands that works there, and it kind of spun him. and he came down on the right side of his face and it was with a terrific splash."

It will serve no useful purpose to attempt to refer in detail to all of the conflicting testimony as to the cause of Harvey's death.

Certiorari to review the award to the claimants was granted upon the petition of the employer and its insurer. The questions raised by relators are whether the commission erred (a) in making its award by accepting expert opinion evidence which they contend is not based upon proper foundation, and (b) in not properly exercising its fact-finding function.

Relators argue that the testimony of Doctors McClellan and Zarling regarding the employee's last illness and death are based entirely on speculation, conjecture, and facts not in evidence, and that they ignored material facts conclusively established in the evidence.

Claimants contend, on the other hand, that the medical testimony of Doctors McClellan and Zarling was not based on speculation or conjecture and that the question of conflicting medical testimony and the weight to be given it was for the Industrial Commission.

Opinions of expert witnesses are to be resolved by the trier of fact and in doing so the trier of fact may determine the comparative weight to be given to the respective opinions and consider the qualifications of each expert and the source of his information. Lee v. Minneapolis St. Ry. Co. 230 Minn. 315, 41 N. W. (2d) 433; Koenigs v. Thorne, 226 Minn. 14, 31 N. W. (2d) 534; 7 Dunnell, Dig. (3 ed.) § 3334.

In the instant case it is very apparent that a pertinent issue is the conflict between the expert witnesses as to what caused the employee's death. That being so, it created a fact question for the commission.

The function of the supreme court upon appeal from a decision of the Industrial Commission is to determine whether the evidence is such that the commission might reasonably have come to the conclusion which it did. If so, its findings will not be disturbed unless they are manifestly contrary to the evidence or unless the consideration of the evidence and inferences permissible therefrom would clearly require reasonable minds to adopt a contrary conclusion. Torrey v. Midland Cooperatives, Inc. 253 Minn. 489, 93 N. W. (2d) 135; Sorensen v. P. H. Thompson & Son, 248 Minn. 280, 79 N. W. (2d) 673; Balow v. Kellogg Cooperative Creamery Assn. 248 Minn. 20, 78 N. W. (2d) 430; 21 Dunnell, Dig. (3 ed.) § 10426.

It is our opinion that there was evidence to reasonably sustain the findings of the commission.

Attorneys' fees in the sum of $250 in connection with proceedings here are allowed the petitioners.

Affirmed.

OTIS, JUSTICE (dissenting).

In arriving at its decision that the injury which occurred to the employee, Harvey Weber, on December 7, 1959, caused his death on June 14, 1960, the Industrial Commission acknowledged the uncertainty of the factors which governed its determination by characterizing the employee as a "museum of medical difficulties."

· In my opinion the findings of fact are unwarranted by the evidence and should be reversed. Minn. St. 176.471, subd. 1(3). The commission has chosen to adopt the conclusion of two doctors who neither treated nor saw the decedent during his lifetime, and has rejected the diagnosis of the two attending physicians who cared for and operated on Mr. Weber during his illness.

The findings of the commission were based largely on the continuity of decedent's deterioration from the time of the accident until the time of his death. However, it is undisputed that between December 7 and December 19, when the employee was first discharged from the hospital, he was found to have a normal electroencephalograph and his only serious symptoms were those of delirium tremens, from which he soon recovered. Even Dr. McClellan, the claimant's witness, conceded that where brain hemorrhage occurs no great improvement or remission of any consequence is possible. Nevertheless, Mr. Weber was sufficiently recovered to be discharged on December 19 and remained at home until the 25th. His return to the hospital resulted from the onset of meningitis which his attending doctor testified was unrelated to trauma but accounted for his hemorrhaging. Dr. Harold Buchstein, who did a craniotomy after his readmission, testified there was no evidence of blood or bruising in the area inspected, and stated that the absence of a skull fracture and the brief period of unconsciousness suggested it was not a serious head injury. It was his testimony that had the meningitis resulted from a fall it would have become apparent very soon. Dr. Zarling conceded that the meningitis developed between December 19 and December 23. In the face of the unqualified opinions of the attending physicians that neither the meningitis nor pneumonia which caused the employee's death had any connection with his fall, the commission chose to adopt the testimony of Dr. McClellan and Dr. Zarling elicited through hypothetical questions and an examination of tissue obtained by an autopsy. In essence Dr. Zarling expressed the opinion, based on a hypothetical question, that decedent sustained small hemorrhages in the brain which in his debilitated condition made him susceptible to infection from which he died.

In view of the undisputed testimony that the decedent was afflicted with "a museum of medical difficulties," in my opinion the

commission was not justified in attributing death to the fall and an increased susceptibility to infection. Before his fall the decedent was suffering from hypertension and the effect of alcoholism and had previously experienced a number of epileptic seizures.

By the same token, I do not believe that the post mortem of Dr. McClellan demonstrated by a preponderance of evidence that the brain hemorrhage, which he testified he found, was attributable to the accident rather than to the results of meningitis. Dr. McClellan conceded on cross-examination that it was impossible to state with any degree of accuracy when the hemorrhaging occurred. In view of Dr. Buchstein's testimony that he found no brain hemorrhage, and in the light of all of the diseases which led to the employee's death, I believe the evidence falls far short of supporting the commission's findings. What we said in Honer v. Nicholson, 198 Minn. 55, 56, 268 N. W. 852, seems to apply with equal force here:

"Taking the testimony of the three medical experts who where called by plaintiff, we find that the one best qualified to testify, the attending physician, stated that the accident and consequent injury were too remote to have had any connection with the fatal termination of the attack of pneumonia. The injury was minor in character. The other two doctors, while stating that deceased's resistance had been lowered by the injury and that it was a contributing cause of death, admitted that death might have ensued in this particular case regardless of the injury. In that state of the record it seems to us that the opinions of the two nonattending medical experts (which is the only evidence attempting to connect the injury with the death) establish a remote rather than a proximate connection between the injury and the death."

The commission has the duty of resolving issues of fact and we may not interfere if there is substantial evidence to support their findings. Nevertheless, in my judgment the medical opinions expressed by the claimants' experts, who had no opportunity to examine the employee during his illness, were of necessity so conjectural and speculative that I believe they do not constitute evidence which preponderates in favor of the claimants' position as a matter of law. Zappa v. Charles Manufacturing Co. 260 Minn. 217, 224, 109 N. W. (2d) 420, 424. For

the reasons stated I would limit recovery to the period of the employee's first confinement ending December 19, 1959.