DONALD FILZEN v. MYRON L. NELSON.

149 N. W. (2d) 78.

March 3, 1967—No. 40,181.

*Lauerman & Willette,* for appellant.
*Everett L. Young,* for respondent.

ROGOSHESKE, JUSTICE.

After a verdict awarding damages to plaintiff upon a claim that his dairy herd became infected with brucellosis (commonly called Bang's disease) as a result of diseased cows leased and delivered to him by defendant, the trial court granted defendant's motion for judgment notwithstanding the verdict. Plaintiff appeals.

The sole question requiring review is whether there was sufficient evidence to support the finding, essential to uphold the verdict, that the disease was transmitted by any of defendant's cows at the time of their delivery to plaintiff under the lease.

In late 1963, plaintiff's dairy herd consisted of between 13 to 18 dairy cows. Plaintiff, intending to enlarge his herd, leased, as he had done in 1959, 1960, and 1961, additional cattle from defendant, who was an auctioneer also engaged in the business of leasing dairy cows to farmers in the area. Pursuant to an oral lease which was later reduced to writing, defendant delivered 11 milk cows to plaintiff in late November or early

December 1963. Plaintiff was first alerted to the possibility of Bang's disease in his herd when he noticed in May 1964 that one of the cows aborted, a symptom of the disease. It was not until July 1, 1964, when a state Ring test revealed the possibility of the disease in plaintiff's herd, and July 25, 1964, when a blood test was taken disclosing four "reactors" showing positive signs of the disease and one "suspect" showing possible infection, that the presence of the disease in plaintiff's herd was confirmed.

According to the expert testimony, brucellosis or Bang's disease is a bacterial disease of the genito-urinary system of cows causing abortions. It is usually accompanied by breeding difficulties and a drop in milk production. Infected animals can transmit the disease in many ways: By depositing "infected material," which may be ingested by healthy animals directly, or through contaminated food or water; or by animal contact, especially by striking the eye of a healthy animal with a contaminated tail. The disease may be spread from place to place by uninfected cattle or other animals, by humans, and by many other "mechanical" means. The disease can remain dormant in an infected animal from 2 weeks to 5 months, although the period of dormancy is usually 30 to 60 days. Two tests are used for detecting the disease, the Ring test and a blood test. The Ring test is performed by the United States State Brucellosis Laboratory on samples of milk supplied by creameries from each producing herd approximately every 4 months. Any reaction to the special antigen used indicates only the possibility of Bang's disease in the herd of origin. If such is shown, investigation is made by the State Livestock Sanitary Board, and each animal of the herd is then given a blood test by a veterinarian. Animals so tested are indicated by a metal ear tag and are classified as negative (not infected), suspect (possibly infected), and reactors (infected). Minn. St. 35.245 requires a blood test before transfer of any animal and a certificate of health to be delivered with each transfer.

Plaintiff argues that the jury could find defendant's cows were infected at the time of delivery by reasonable inference from the following evidence: There was no history of Bang's disease in his herd since he started it in 1958; his herd submitted to an area blood test for Bang's disease in 1961, which was negative; defendant's cows were delivered

without certificates that they had been tested and found free of the disease; defendant was unable to produce records, except as to three cows, supporting testimony that all of the cows leased had blood tests in November 1963; the disease first appeared in some of defendant's cows which aborted in May 1964, milk production dropped substantially after February; the Ring tests of July 1964 showed the possibility of the disease; and blood tests of July 1964 revealed that both defendant's and plaintiff's cows were in fact infected.

In addition, he relies on testimony that three additional herds into which defendant's cows were introduced became infected about the same time. Finally, Dr. Eliason, the veterinarian who conducted the July 1964 test, testified in behalf of plaintiff and expressed his opinion in answer to a hypothetical question that the infection was due to the fact that "cattle were introduced" from defendant's farm to plaintiff's farm.

The jury gave a verdict for the plaintiff, but the trial court granted a judgment n. o. v., stating:

"In the opinion of the Court there was not sufficient evidence to show that the herd of the defendant was diseased at the time the cattle were rented from him by the plaintiff. There was no showing that either or any of the cattle rented were diseased at the time of delivery, nor that there was any disease in defendant's herd.

"Although it is true that the plaintiff's cattle became diseased, there is no showing that the disease was transmitted by defendant's cattle.

"There are so many ways in which brucellosis or Bang's disease can be transmitted that to say that there was a breach of an implied warranty in this kind of a fact situation would be based on speculation and conjecture."

We have carefully reviewed the evidence and are compelled to agree with the trial court. While it is true that plaintiff had no history of Bang's disease in his herd, it is equally true that defendant's herd, which the evidence discloses was a much larger number of cattle, also had no history of the disease according to the uncontradicted testimony of the veterinarian who tested defendant's cattle for many years. It is true that the evidence discloses that several other herds into which defendant's cows were in-

troduced in 1963 did have incidences of Bang's disease the following year. However, the testimony that the infection was caused by defendant's cows is confusing, ambiguous, and inconclusive. In one of these cases, the farmer categorically denied that any of the cattle leased by defendant were infected. In another case, there was no showing that the cattle leased from defendant were infected or not. In the third case, although there was testimony that several of defendant's cows were found to be infected, there was no showing that the infected cows were those leased in the fall of 1963 or those which the farmer had leased from defendant 1 or 2 years earlier.

After making all due allowance in plaintiff's favor, there is no evidence which would adequately support the conclusion that defendant's cows were infected at the time of delivery. There is no testimony that defendant's herd ever had Bang's disease before delivery. On the contrary, the testimony by defendant's veterinarian was that, despite the absence of records or health certificates, defendant's cattle were tested immediately prior to that time and found "negative." Two of the cows delivered calves just prior to delivery, and the remainder had calves before the end of January 1964. These births were normal in every respect.[1] Had the cows been infected at the time of delivery, it would be characteristic of the disease that some of them would have aborted. The testimony is undisputed that the cows thereafter submitted to rebreeding and conceived without difficulty. If such had not occurred, the possible presence of the disease would be indicated. In addition, the unmistakable finding of infection did not occur until July 25, 1964, over 7 months after the date of delivery. The Ring test made of the milk plaintiff's herd produced in March 1964 showed no suspicion of the disease at least 3 months after delivery, and it was not until July 1, 1964, that a Ring test indicated possible infection. The first indication of the disease was the abortions in May 1964, nearly 6 months after delivery, which, considering the usual period of dormancy, tends to disprove plaintiff's claim

---

[1] Several of the calves died shortly after their birth, as did some calves from plaintiff's herd, and the evidence is explicit that this provided no basis to draw an inference that the cows rented were infected.

of the presence of infection in November or December 1963. The outbreak of the disease occurred while the cows were in plaintiff's possession, pastured with other cattle and not confined from many other sources of infection, including a stream which ran from a spring in an adjoining pasture. Since the other possible sources of infection are equally persuasive, in our opinion the verdict of the jury upon this evidence is speculative, justifying the trial court's action.[2] In reviewing such action, it was stated in McDonough v. Newmans Cloak & Suit Co. 247 Minn. 250, 256, 77 N. W. (2d) 59, 63, 61 A. L. R. (2d) 100, 105:

"* * * [T]he evidence must be something more than consistent with plaintiff's theory of how the accident happened, and * * * reasonable minds must be able to conclude from the circumstances that the theory adopted by the verdict outweighs and preponderates over any other theory."

The only other evidence upon which the jury may have relied is the opinion of the veterinarian called by plaintiff, whose opinion was based solely upon the evidence previously related. Moreover, in giving his opinion, he appeared to assume that the source of the disease could not have been caused by any "mechanical" carriers and that defendant's cattle were in fact not tested before delivery, and he relied upon hearsay statements concerning the source of infection in another herd containing cows leased by defendant. An opinion based on speculation and conjecture has no probative value. Zappa v. Charles Mfg. Co. 260 Minn. 217, 109 N. W. (2d) 420; Albert Lea Ice & Fuel Co. v. United States Fire Ins. Co. 239 Minn. 198, 58 N. W. (2d) 614.

Affirmed.

Mr. Justice Peterson, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

[2] Saaf v. Duluth Police Pension Assn. 240 Minn. 60, 67, 59 N. W. (2d) 883, 887.