Glen DAHLBECK, Respondent,

v.

DICO COMPANY, INC., Appellants.

Honeywell, Inc., Respondent,

Cutler-Hammer Inc., et al., Respondent.

DICO COMPANY INC., et al., third party plaintiffs, Appellants,

v.

NEW LONDON CONCRETE PRODUCTS AND SUPPLY COMPANY, third party defendant, Respondent,

APM Corporation, third party defendant, Respondent.

Nos. C5–83–1269, C4–83–1733.

Court of Appeals of Minnesota.

Sept. 4, 1984.

Mark N. Stageberg, Minneapolis, for respondent Glen Dahlbeck.

Duane E. Arndt, Minneapolis, for appellants.

Patrick J. Sauter, Minneapolis, for respondent New London Concrete and Supply Co. .

Michael T. Nilan, Minneapolis, for Culter-Hammer Inc.

Heard, considered and decided by POPOVICH, C.J., and HUSPENI and NIERENGARTEN, JJ.

## OPINION

NIERENGARTEN, Judge.

The opinion of August 14, 1984, is hereby withdrawn and the following opinion is substituted.

This is an appeal from a judgment against defendant DICO Company, Inc. (DICO) on a products liability claim. DICO asserts the trial court erred in directing a verdict in favor of third-party defendant New London Concrete and Supply Company (New London), in granting summary judgment to defendant Cutler-Hammer, Inc. (Cutler-Hammer), in ruling on various evidentiary matters, on the sufficiency of the evidence against DICO, in the constitutionality of submitting the question of both liability and punitive damages to the jury simultaneously, in the assessment of costs and disbursements, and in its instructions to the jury. We affirm.

## FACTS

Plaintiff Dahlbeck, a truck driver with thirty years experience, was injured on July 2, 1974, while delivering a load of concrete building blocks to a farm site for his employer, third-party defendant New London. He drove a new White truck equipped with a new DICO Model 40–25 trolley boom hoist manufactured and installed by defendant DICO.

The trolley boom was operated from either a master control box or a hand-held control unit. The hand unit was attached to a cord extending out from a storage box mounted underneath the rear of the truck bed behind the left rear wheels. It was a cast-aluminum mold with four toggle switches to operate the boom, plus an emergency switch. The toggle switches, when released, return to a neutral position, stopping movement of the boom. Two of the four function switches were replaced by Dahlbeck before the date of this accident because they malfunctioned. The boom up/down switch had never been replaced.

The original switches were manufactured by Cutler-Hammer and ordered from their catalog by DICO. DICO covered the switches with a rubber boot manufactured by APM Corporation (APM) for the purpose of minimizing the number of contaminants that might possibly enter the switch, such as dirt, moisture and temperature extremes, for contaminants might cause the switch to fail. The boot does not totally seal the switch. Environmentally sealed switches, which do provide a complete seal, were available for purchase through Cutler-Hammer's catalog.

On arrival at the farm site, Dahlbeck selected a level unloading site across the driveway from the construction site and parked the truck near a power line which he had observed. A warning on the truck required a minimum of ten feet clearance from the lowest power line. Dahlbeck believed he had at least twelve feet clearance.

Dahlbeck began unloading the truck, using the hand unit to operate the trolley boom, or boom hoist. While unloading the fourth pallet of block, Dahlbeck released the boom up switch, but the boom kept rising. He attempted to move the switch back to the neutral position without success and then tried to activate the emergency switch. The boom contacted the power line and Dahlbeck suffered severe electrical burns to nearly 40% of his body. He remains totally disabled.

Several power company and New London employees arrived at the scene after the accident and found the switches in the hand unit were operable except the boom up switch. The boom up switch was replaced and the inoperable switch was placed in a drawer with other miscellaneous parts. Another Cutler-Hammer switch from this drawer was examined approximately 6 years later at which time contaminants were observed in the interior portion of the switch. Dahlbeck sued DICO, Cutler-Hammer, who supplied the toggle switches which operated the hoist, and several other parties not relevant here. DICO then asserted third-party claims against New London and APM.

At trial, only Cutler-Hammer, DICO and New London remained as defendants. Cutler-Hammer was granted summary judgment on the first day of trial and Dahlbeck continued against DICO and New London. New London was granted a directed verdict and the case was submitted to the jury as to the fault of DICO on both negligence and strict liability theories. The jury found DICO both negligent and strictly liable, fixing fault at 30% for Dahlbeck and 70% for DICO. Compensatory damages of $2,040,214 were awarded and although the question of punitive damages was submitted to the jury, there was no award. DICO's portion of the judgment was calculated at $1,428,149.80 and judgment was entered thereon on June 3, 1983, followed by a taxation of $14,815.12 in costs and disbursements, primarily for witness fees and deposition expense.

### ISSUES

I. Whether the fault of Cutler-Hammer, New London and APM were jury questions.

II. Whether the trial court ruled properly on the following evidentiary matters:

1. Refusal to take judicial notice of OSHA rulings.

2. Refusal to receive the OSHA investigation report.

3. Admitting expert opinions as to causation by contamination without direct evidence.

4. Admitting evidence of design changes made subsequent to the accident.

5. Excluding testimony regarding the origin of the warning language.

6. Excluding co-worker testimony from a photograph.

7. Insufficient foundation for damages testimony.

8. Excluding co-worker opinion on causation.

III. Whether there was sufficient foundation for the jury to find the cause of the accident.

IV. Whether DICO's due process rights were violated by submitting liability and punitive damages simultaneously.

V. Whether the trial court acted within its discretion in assessing costs and disbursements.

VI. Whether the jury instructions were proper.

### ANALYSIS

#### I.

No Jury Question on Fault.

1. Cutler-Hammer Summary Judgment

■ Liability of Cutler-Hammer had to be predicated on either 1) defective manufacture of the switch, or 2) failure to properly advise DICO that the switch provided was improper for the hand-held unit design.

At the time of summary judgment, two experts of Dahlbeck had testified by deposition that the most probable cause of the toggle switch failure was contamination because the design of the box storing the switch did not adequately protect the hand unit by sealing off the switches from contamination from such sources as dust, moisture and temperature extremes. They further contended the hand unit material should have been non-conductive. DICO's expert testified by deposition that the probable cause of the accident was improper

operation of the truck near the power lines. He was unable to give an opinion as to switch failure based on any known evidence. There was no expert testimony as to the actual cause because an investigation of the accident was not conducted until six years after the accident and the original switch had been misplaced. This, then, was the sole evidence before the court as to the issue of defective manufacture, and it is insufficient to withstand a summary judgment motion.

■ As to the claim that Cutler-Hammer failed to properly warn DICO of the hazards of using this particular type of switch, DICO's chief engineer of the hoist division from 1968–71, who chose the switches, testified that he was aware the switches were not totally sealed and that environmentally sealed switches were available. The engineer did not rely on Cutler-Hammer for recommendations and had not contacted Cutler-Hammer personnel. Under these conditions, DICO could hardly claim fault on the part of Cutler to improperly advise, for "a manufacturer has no duty to warn when the dangers of a product are within the professional knowledge of the user." *Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682, 687 (8th Cir. 1981). The adequacy of a warning "cannot be evaluated apart from the knowledge and expertise of those who may reasonably be expected to use or otherwise come in contact with the product...." *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 465–66 (5th Cir.1976), cited with approval in *Strong*, 667 F.2d at 687.

■ The multitudes of switches offered by Cutler-Hammer could be used in many different ways. "[A] purchaser of multi-use equipment knows best the dangers associated with its particular use, and so it should determine the degree of safety provided." *Wagner v. International Harvester Co.*, 611 F.2d 224, 231 (8th Cir.1979). *See Verge v. Ford Motor Co.*, 581 F.2d 384 (3rd Cir.1978). In *Bilotta v. Kelley Co.*, 346 N.W.2d 616 (Minn.1984), the supreme court limited the application of this rule to situations where an "optional safety device would impair the equipment's utility in the uses for which the device is unnecessary." *Id.* at 624. Our factual situation is not precisely identical, but is conceptually the same. There are many uses of this switch which do not require further safety precautions. It cannot be claimed that DICO was not aware of the dangers associated with the use of the Cutler-Hammer switch.

### 2. Directed Verdict for New London.

■ A directed verdict is appropriate only in the clearest of cases where no jury could reasonably decide to the contrary. *Wohlfeil v. Murray Machinery, Inc.*, 344 N.W.2d 869, 873 (Minn.Ct.App.1984). "The trial court may direct a verdict for the party in whose favor the evidence overwhelmingly preponderates even though there is some evidence in favor of the adverse party." *Frey v. Montgomery Ward & Co.*, 258 N.W.2d 782, 786 (Minn.1977).

■ DICO claims that New London failed in its duty to provide a safe place to work by failing to investigate the work site for power lines and in failing to check its equipment daily under OSHA regulations. DICO failed to establish a common-law duty to deenergize the power lines at the work site. The company held regular safety meetings. Dahlbeck was not only aware of the dangers presented by power lines but, in fact, had trained other drivers in safety precautions.

There was no showing that the truck, less than two months old, was improperly maintained or that the failure to inspect constituted negligent behavior. Neither was it shown at trial that OSHA regulations required daily inspections. Even if there was a duty to inspect daily, there was no evidence that potential switch failures could be detected in advance of a malfunction.

### 3. Refusal to submit fault

■ DICO contends Cutler-Hammer, New London, and APM are at fault and that fault should have been submitted to the jury for comparative negligence find-

ings under Minn.Stat. § 604.01 (1982) even though Cutler-Hammer and APM had been dismissed by the Court. Section 604.01 only requires submission of fault as to any "person against whom recovery is sought." Minn.Stat. § 604.01 (1982). Once removed from the trial, either by summary judgment or directed verdict, there was no basis for such submission.

DICO's third-party claim against APM alleged that the rubber boot used as a cover for the toggle switch was defective because it allowed dust to enter the switch and, if the switch failed, it was proper to infer that the boot did not do the job for which it was designed. APM never promised a complete seal. That fact was known by DICO's chief engineer. There was no evidence that the boot was cracked or otherwise damaged nor was there any evidence that the boot failed to meet DICO's requirements.

## II.

### Evidentiary Rulings

1. Refusal to take judicial notice of OSHA regulations.

■■■ DICO asked the trial court to take judicial notice of certain OSHA regulations to establish the duty of the employer in the workplace. The regulations simply reflected New London's duty to use reasonable care to provide a safe workplace. The court refused on the grounds that DICO never clearly identified which standards applied in 1974 and which applied to this hoist. The Federal Register shall be judicially noticed unless it is not relevant. 44 U.S.C.A. § 1507 (1969); *Vallot v. Central Gulf Lines, Inc.*, 641 F.2d 347, 351 (5th Cir.1981). Since the directed verdict was properly granted on the showing that New London met its duty of reasonable care, there was no prejudicial error in excluding the OSHA regulations. *See Vieths v. Ripley*, 295 N.W.2d 659, 665 (Minn.1980).

2. Refusal to receive the OSHA inspector's investigation report.

■■■ DICO asked the court to take judicial notice of a preliminary investigation report prepared by an OSHA employee for the primary purpose of evaluating compliance with OSHA regulations. It contained conclusions favorable to DICO.

The trial court properly refused to receive the report under Rule 803(8) of the Minnesota Rules of Evidence as a public records exception to the hearsay rule because it contained conclusions, not factual findings. *See Barnes v. Northwest Airlines Inc.*, 233 Minn. 410, 433, 47 N.W.2d 180, 193 (1951) (Public records containing expressions of opinion or the exercise of judgment and discretion are not within public records exception to the hearsay rule).

3. Admitting expert opinions as to causation without direct evidence.

■■■ There was no direct evidence that the switch was contaminated on July 2, 1974. However, two experts testified that the most likely cause of switch failure was contamination. The testimony was based upon an inspection of the accident site and the boom hoist, their observation of the boom hoist operation, and by dismantling similar switches. Liability "must be based upon inferences reasonably supported by the evidence and not upon speculation based solely on the occurrence...." *Rochester Wood Specialties, Inc. v. Rions*, 286 Minn. 503, 509, 176 N.W.2d 548, 552 (1970). There was, however, circumstantial evidence of such substance that contamination could reasonably be considered as a cause of the failure.

4. Admitting evidence of subsequent changes in design.

■■■ A. Correspondence from Cutler-Hammer to DICO in 1976, two years after the accident, revealed Cutler-Hammer had suggested a change to switches with an internal lever seal which provided added environmental protection. DICO claims the correspondence was inadmissible under Rule 407, Minnesota Rules of Evidence which prohibits introduction of remedial measures taken after an accident to prove negligence. While that may be true, the

evidence could be admitted to show the feasibility of precautionary measures taken relative to a product defect. Minn.R.Evid. 407. In addition, Rule 407 does not apply to strict liability because negligence is not at issue. Therefore, subsequent changes in design are admissible to prove that a product was defective. *See Unterburger v. Snow Co.*, 630 F.2d 599 (8th Cir.1980) (similar federal rule).

 B. A 1978 notice by DICO about safety changes in the trolley booms was admitted by the trial court to show feasibility of more detailed warnings. DICO contends it only goes to feasibility in 1978. Subsequent alterations in warnings may be admissible to show "feasibility of a more adequate warning of the risk involved." *Sterner v. U.S. Plywood-Champion Paper, Inc.*, 519 F.2d 1352, 1354 (8th Cir.1975).

5. Excluding testimony regarding origin of warning language.

 DICO sought to introduce testimony by Dahlbeck's expert that the warning on the DICO hoist regarding proximity to power lines was consistent with OSHA regulations and therefore showed DICO had exercised due care. The court properly excluded the testimony because of the confusion over which regulations applied to this hoist and on the further ground that OSHA regulates employers and employees, not product manufacturers.

 In view of Dahlbeck's testimony that he was aware of the warning, understood it, taught it to new employees, and obeyed it on the day of the accident, the reasonableness of the warning became a jury question.

6. Excluding co-worker testimony from photograph.

 DICO wanted a co-employee of Dahlbeck to testify from accident pictures that Dahlbeck must have been unloading a different pallet than the one about which he testified, thus lending credence to DICO's theory of operator error.

The co-worker was not at the scene. Although lay opinions are permitted by Rule 701, Minnesota Rules of Evidence if based on first hand knowledge, the trial court has wide discretion to determine if the witness has sufficient expertise to give an opinion under Rule 702 which covers expert testimony. The court here found the co-worker's opinion speculative, given the mobility of the boom and forks. Such testimony would do little more than interpret photos, a function the jury was quite capable of performing. *Dunshee v. Douglas*, 255 N.W.2d 42, 48 (Minn.1977).

7. Insufficient foundation for damages.

 DICO first objects to the introduction, through Dahlbeck's primary physician, of a document describing Dahlbeck's special housing needs, a document signed by the doctor but prepared by another. The doctor's testimony as to his knowledge of Dahlbeck's needs and the reasonableness of the recommendations contained in the document constituted sufficient foundation for its receipt into evidence.

 DICO further objects to Dahlbeck's testimony regarding his loss of earnings from trapping, contending there was no basis for his testimony as to the price of furs and his yearly income from trapping. Dahlbeck testified regarding his extensive contacts with several fur buyers, which continued after the accident. Dahlbeck was in the best position to testify as to his lost earnings.

 Dahlbeck also produced evidence of the earnings of a co-employee who replaced Dahlbeck at New London. The evidence was admissible as to Dahlbeck's potential earnings.

8. Excluding co-employee opinion as to causation.

 DICO attempted to have a co-employee of Dahlbeck render his opinion that the accident was caused because Dahlbeck was blinded by the sun, arguing that the co-worker's experience and presence at the scene after the accident makes his opinion

helpful to the jury under Rule 701, Minnesota Rules of Evidence, even if he was not present at the time of the accident.

An observation of a sunny day does not provide adequate foundation for an opinion on causation and it was properly excluded as speculation.

## III.

### Sufficient Foundation to Infer Actual Cause of Accident.

There is little evidence in the record to support any cause of this tragic accident other than contamination of the toggle switch, although theories of causation abounded. That DICO's improper design, including the toggle switch, "outweighs and preponderates over any other theory", *Filzen v. Nelson,* 276 Minn. 146, 150, 149 N.W.2d 78, 81 (1967) (quoting *McDonough v. Newmans Cloak & Suit Co.,* 247 Minn. 250, 256, 77 N.W.2d 59, 63 (1956)), is supported by the record.

## IV.

### DICO's Rights of Due Process were not Violated by Submitting both Liability and Punitive Damages Simultaneously.

DICO argues the submission of punitive damages to the jury stigmatized DICO's name and tainted the evidence by revealing the handsome financial condition of DICO. While no punitive damages were awarded against DICO, the amount of compensatory damages awarded could possibly have been affected as well as determination of liability itself by the submission of punitive damages and its attendant financial disclosures. But DICO can hardly complain now when it made no attempt to sever the issues at trial.

## V.

### Taxation of Costs and Disbursements

A prevailing party may recover costs for necessary disbursements. Minn. Stat. § 549.04 (1982). The award of costs for depositions is within the trial court's discretion and will not be reversed except for a clear abuse of discretion. *Striebel v. Minnesota State High School League,* 321 N.W.2d 400, 403 (Minn.1982). The trial court should always carefully scrutinize these types of costs for:

[t]he burden is on the prevailing party to show both that the depositions and copies were necessary to the conduct of the litigation and that they were effectively and pertinently used by the prevailing party.

*Romain v. Pebble Creek Partners,* 310 N.W.2d 118, 124 (Minn.1981).

The trial court "is in the best position to judge what is truly necessary and what is only useful." *Id.* There was no clear abuse of discretion in this case.

The award of expert witness fees is also discretionary. *Peterson v. City of Elk River,* 312 N.W.2d 243, 246 (Minn. 1981). Rule 11 of the Code of Rules for the District Courts provides for expert witness fees of $100 per day, subject to increase by a judge on appeal. Code R.Dist.Ct. 11.

The fees assessed were almost $13,000, including large amounts for medical testimony. A serious injury coupled with a product liability claim is always an expensive venture. Until some new method of expert procurement is devised, a losing party may as well resign itself to the inevitability of large costs that are within the discretion of the court to assess under Rule 11. There was no clear abuse of the broad discretion granted the trial court.

## VI.

### Jury Instructions

DICO was properly denied the following instruction: "The manufacturer has no duty to warn of dangers that are obvious to anyone, including the user of its product." The latent/patent danger rule has been expressly rejected in Minnesota. *Holm v. Sponco Mfg., Inc.,* 324 N.W.2d 207, 213 (Minn.1982). In its place *Holm* approved the "reasonable care" balancing test. *Id.* The jury was instructed that the

obviousness of the danger to Dahlbeck was a factor to consider which they obviously considered in finding Dahlbeck's fault at 30%.

 DICO also requested an instruction to the jury that if they could not conclude which of several causes produced the injury, a defendant responsible for only some causes could not be held liable. The failure of the trial court to give this precise instruction did not prevent the jury from finding DICO not liable under the instructions of the court. "The instruction of the trial court must be read in its entirety, and all that is necessary is that it convey to the jury a clear and correct understanding of the law." *Seivert v. Bass*, 288 Minn. 457, 467, 181 N.W.2d 888, 894 (1970).

DICO contends that the trial court erred in giving a strict liability instruction that is inconsistent with *Bilotta v. Kelley Co.*, 346 N.W.2d 616 (Minn.1984), and failed to instruct on the required causation between defect and injuries. The trial court did instruct on the necessary causation between the defect and the injury in stating that plaintiff must prove that his "injuries occurred because the model 40–25 trolly boom was in a defective condition."

*Bilotta* had not been decided at time of trial and the instruction does reflect some of the confusion felt following *Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207 (Minn. 1982). However, the instruction given the jury included the essential nature of the *Bilotta* reasonable care balancing test and was sufficiently comprehensive to cover the fact issues and allow the jury to arrive at its verdict in reasonable fashion.

### DECISION
The judgment is affirmed.