# SILVIO DANUSSI v. EASY WASH, INC., AND ANOTHER.

134 N. W. (2d) 138.

March 26, 1965—No. 38,957.

*F. L. Palarine,* for relator.
*Joseph Grill,* for respondents.

FRANK T. GALLAGHER, C.

Certiorari to review a decision of the Industrial Commission.

Silvio Danussi, the employee, alleged in his claim petition, dated August 24, 1960, that on or about December 15, 1959, he sustained a personal injury to and an infection of his right foot resulting in amputation of his leg above the knee. He claims that the injury arose out of and in the course of his employment as a laborer digging a trench. The answer of Easy Wash, Inc., employer, and Travelers Insurance Company, its insurer, consisted of a general denial, and set up as a further defense that the employer did not have actual notice of the occurrence of the injury and that the claim is barred by the statute of limitations.

It appears from the record that the employee, age 65, worked for the employer as a part-time laborer in 1959. On December 14 of that year, he reported for work at the employer's office and was given a ride to a laundry in New Brighton to do some inside work. From there he was transferred to employer's Giant Wash on Highways 212 and 200 to help Howard Young, another part-time laborer, dig a trench approximately 1 foot deep, 14 inches wide, and 170 feet long, in which to run electric lines from the east side of the building to a post where a laundry sign was to be attached. Young had already completed a portion of the trench. Although the testimony conflicts, it appears that Young and the employee worked together from about 12 noon until 5 p. m. that day. He was wearing light, high-top shoes, no rubbers, and a jacket. Because it was cold and damp outside,[1] he wanted a ride home to change his clothes. This was denied, so he borrowed a pair of gloves and after digging a short time he complained to Young about being cold.

He was allowed to go into the nearby laundromat to warm up. The rest of the afternoon the two men would work a half hour and warm up 10 minutes. It was noticed that during that time this employee would

[1]Employee's exhibit A, a United States weather report, indicates an average wind velocity that day of 6.9 miles per hour from the southwest, 1 inch of snow from 6 a. m. through 10 a. m., and 35 degrees above zero between 12 noon and 6 p. m.

take his shoes off to warm his feet. It appears that the ground where they were digging was frozen and hard. The employee said there was some moisture about, which caused his feet to get wet, and that he froze his foot that day.

Young gave the employee a ride home after they quit work about 5 p. m. At that time the employee claimed that his feet were cold. Upon reaching home, he soaked his feet in hot water and noticed that his right foot was red and swelling. He continued to soak his feet during the next 3 days and observed that his fourth toe on his right foot was beginning to discolor.

On December 17, 1959, the employee went to Ancker Hospital, St. Paul. The receiving room record showed that his foot was red on "dependency" and white when "elevated." There were prolonged vascular filling, questionable popliteal pulse, no posttibial or dorsalis pedis pulse on palpation, and muscular fatigue. The "impression" recorded was arteriosclerosis and possible recent thrombosis of the right popliteal artery.

Apparently the employee was not admitted to the hospital at that time, but returned later that month and would have been admitted then but he put it off until January 7, 1960. After his failure to obtain admission to Ancker Hospital on December 17, 1959, he consulted Dr. Henry N. Kaldahl, a podiatrist, between December 23, 1959, and January 6, 1960. Dr. Kaldahl testified that he found the patient's fourth right toe slightly cyanotic (bluish) with considerable devitalized tissue at the end. There was generalized swelling, redness, and the toe was moist. He attributed the moistness to a failure of the venous system to return the blood deposited by the arteries. Dr. Kaldahl's treatment was to debride the toe and apply an ointment and dress it. He continued to observe the toe and finally concluded it was gangrenous, and made an appointment with Dr. Charles H. Manlove, a surgeon. The employee did not keep his appointment with that doctor before entering Ancker Hospital on January 7, 1960. The diagnosis at that time was arteriosclerotic gangrene of the right fourth toe, and the record contained the remark, "Gives no history of exposure to cold."

On January 12, 1960, Dr. John B. Brainard, senior resident in sur-

gery at Ancker Hospital, examined the employee and performed a right femoral arteriogram. This procedure revealed a blockage of the femoral artery about 15 centimeters in length. Consequently, on January 13, 1960, Dr. Brainard performed a right femoral endarterectomy and a right lumbar sympathectomy. This surgery resulted in the removal of a 2-inch core and several other pieces of arteriosclerotic material and was apparently successful, as the employee was released on January 27, 1960, and instructed to return one week later for observation. He did not do so.

For undisclosed reasons he went to Chicago and was admitted to Cook County Hospital on February 5, 1960. The diagnosis there was a gangrenous toe with edema of right lower leg and foot. It was observed that his right *leg* was cooler than the left. On February 8, 1960, he was released because it was thought that his right toe would fall off by itself. However, on February 10, 1960, he was readmitted because of pain in his foot. The diagnosis this time was "gangrene of toe on basis of arteriosclerosis obliterans." On February 12, 1960, his fourth right toe was amputated, and he was released February 17, 1960. On March 10, 1960, he was admitted once again with gangrenous toes. His right toes were turning black. The diagnosis was again femoral occlusive gangrene. On March 18, 1960, his right leg was amputated above the knee. He was finally released May 24, 1960, and returned to St. Paul.

We shall not attempt to set out in detail all of the medical testimony presented at the hearing before the referee, but will refer to the differing opinions as to the cause of the employee's condition.

Dr. Kaldahl was asked on direct examination whether he had formed an opinion as to the cause of the condition of the employee's toe and foot. He replied that it would be difficult for him to make a positive statement but the general damage of the toe would indicate that there was probable frostbite. On cross-examination, he said it was possible that the condition could have been due to arteriosclerosis but that he did not make an examination concerning such a cause as that would require an X ray.

Dr. John A. Boswick, who amputated the employee's right leg above

the knee on March 18, 1960, at Cook County Hospital, following the amputation of his toe in February, testified in answer to a hypothetical question that he felt, from the history described and the information that had been given him, that the employee had a generalized arterio- sclerotic process, and that he had sustained a thermal injury which ag- gravated the tissues of his right lower extremity, "resulting most likely in the conditions that have been described." He was then asked:

"Q. And which you found upon your examination in March and for which you operated?

"A. Well, no. Now, everything that was found at that time is not the same as we found in March. I don't want to relate the two. In other words, the findings might have been from the same result but we have other conditions found and I don't want this to say it's on what we found in March.

"Q. Because it could be something else?

"A. That's right."

On cross-examination by employer's attorney, referring to the hypo- thetical, the doctor was asked if by changing some of the assumptions in the hypothetical he had answered "from [employee's] contention to our contention" he would be able to form an opinion, and the answer was "no." The commission commented in its opinion, "It is quite evi- dent from the testimony in the deposition by Dr. John Boswick that there were discrepancies between the facts in the hypothetical as pre- sented."

Dr. Manlove, another medical witness called by the employee, tes- tified that his condition could have been due to something other than exposure to cold; that it could have been due to a general aging process or to natural progression of arteriosclerosis. He agreed that it was con- ceivable that cold could have been its cause, but he could not say wheth- er or not it was.

Dr. Davitt A. Felder, a witness for the employer, has been a surgeon since 1942. He said that he had limited his practice to cardiovascu- lar surgery since 1951, and during that period has had experience with frostbite cases at Minneapolis General, Ancker, and University Hos- pitals. He examined this employee on December 6, 1960, and also

examined the Ancker Hospital and Cook County Hospital records. In response to a lengthy hypothetical question, he said that he thought that it was impossible that there was a causal connection between the loss of the employee's extremity and his exposure under the circumstances set out in the hypothetical question. It was his opinion that "this is an expected progression of arteriosclerosis obliterans in this patient; namely, that he should eventually develop ischemia and then gangrene and this in turn necessitated amputation."

The referee found that on December 14, 1959, the employee sustained a personal injury consisting of frostbite to his right foot arising out of and in the course of his employment and that the employer had notice and knowledge of the injury within the statutory period.

On appeal, the Industrial Commission found that the employee did not suffer personal injury or occupational disease as a result of his employment but had become disabled because of arteriosclerosis which was not caused or aggravated by his employment, and denied his petition. We are asked to review that decision.

Since Dr. Brainard, who had treated the employee while he was at Ancker Hospital, had not been called as a witness by either party at the hearing before the referee, the commission ordered that he be called as a witness before the commission with the opportunity for cross-examination by both sides. It was the opinion of Dr. Brainard that occlusion of the superficial femoral artery caused the gangrenous condition of the employee's toe and the coldness and color changes in his foot. He thought it was most unlikely that the gangrene resulted from frostbite or that the employee could have suffered frostbite during the trench digging since the temperature was not low enough. He said if frostbite had occurred the other toes would probably have been involved, and there would have been some blistering of the skin, which there was not. He also stated that the toe was dry, *not* moist, an indication of arteriosclerotic gangrene. He did not amputate the toe, because it was dry and shapeful and would fall off by itself. He felt there was no danger of the condition spreading.

The employee by his assignments of error contends that the commission erred in setting aside the findings and determination of the

referee; in finding that he did not suffer a personal injury or disease as the result of his employment but contracted arteriosclerosis which was not caused or aggravated by his employment; in admitting in evidence records of Ancker Hospital; in overruling his objections to the examination and use of said records and information contained therein as a basis for the opinion of Dr. Felder; in ordering Dr. Brainard to testify and in receiving his testimony over objection; in refusing to strike it from the record; and in permitting the doctor to use Ancker Hospital records as a basis for his opinion.

1-2.   On review it is the commission's findings and not the referee's that this court considers. Yureko v. Prospect Foundry Co. 262 Minn. 480, 115 N. W. (2d) 477. The existence of a causal relationship between an alleged work-related injury and the disability for which compensation is sought is ordinarily a fact question, and if reasonable inferences may be drawn either way the facts found by the commission must stand. Zappa v. Charles Mfg. Co. 260 Minn. 217, 109 N. W. (2d) 420. The commission's determination of a fact question will not be disturbed on appeal unless it is manifestly contrary to the evidence. Schwerzler v. Frankamp, 255 Minn. 95, 95 N. W. (2d) 503; Torrey v. Midland Cooperatives, Inc. 253 Minn. 489, 93 N. W. (2d) 135. The duty of weighing the testimony and drawing inferences therefrom was that of the commission, which appears to have been carried out in the instant case. This court on appeal cannot substitute its judgment for that of the commission. Luthens v. Glencoe Red & White Store, 264 Minn. 26, 117 N. W. (2d) 386.

3.   It is true that there is considerable conflict here in the doctors' testimony as to the cause of the employee's condition. A conflict in the opinion of medical experts, the same as a conflict in the testimony of other witnesses, must be resolved by the commission as the trier of fact. Anderson v. Armour & Co. 257 Minn. 281, 101 N. W. (2d) 435. See, also, 7 Dunnell, Dig. (3 ed.) § 3334. Triers of fact in workmen's compensation proceedings must choose not only between conflicting evidence, but also between opposed inferences. Engel v. Starry, 268 Minn. 252, 128 N. W. (2d) 874.

4.   We do not agree with the employee's contentions that the com-

mission erred in admitting into evidence the hospital records and in overruling his objections to their use as a basis for the opinion of Dr. Felder. Minn. St. 176.411, subd. 1, provides in part:

"* * * when the commission, a commissioner or referee makes an investigation or conducts a hearing, it or he is bound neither by the common law or statutory rules of evidence nor by technical or formal rules of pleading or procedure. The investigation or hearing shall be conducted in a manner to ascertain the substantial rights of the parties.

"Findings of fact shall be based upon competent evidence only."

Section 176.231, subd. 6, requires the commission to keep fully informed of the nature and extent of all injuries compensable under the chapter, their resultant disabilities, and the rights of employees to compensation. It also provides that where a physician or surgeon has examined, treated, or has special knowledge relating to an injury which may be compensable, the commission shall request in writing a report from such person of the attendant facts. Subd. 7 of that section further provides that if the commission requests it, an employer, insurer, or employee shall file with it the original or a verified copy of any medical report in his or its possession which bears upon the case.

This court has stated that proceedings under the Workmen's Compensation Act are not governed by strict rules of evidence, Johnson v. Iverson, 175 Minn. 319, 221 N. W. 65, 222 N. W. 508, nor subject to rules of evidence governing courts. Debeltz v. Oliver Iron Min. Co. 172 Minn. 549, 216 N. W. 240.

It seems obvious from an analysis of the above statutes and cases that it was the intention of the legislature not to bind the commission or its referees to strict common-law or statutory rules of evidence in making its investigations or conducting hearings in workmen's compensation cases. Rather, it would appear that they were given wide latitude in order to try to find out as far as humanly possible what are the substantial rights of the parties so that justice and fairness would result. Upon a review of Dr. Felder's testimony in the light of the above statutes and decisions, we do not find that the commission erred in admitting the testimony of the doctor and the records of Ancker Hospital or in its rulings with respect to their use.

The foregoing authorities apply also to the issues raised by the employee's assignments of error concerning the commission's action in calling Dr. Brainard to testify and its rulings with respect to his testimony. Apparently, the commission considered that it was its statutory duty under the facts and circumstances here to call Dr. Brainard, who had not been called by either of the parties. An examination of the doctor's testimony indicates that as a physician attending the employee at Ancker Hospital he had what might well be referred to as special knowledge relating to the employee's injury. The latter, however, claimed privilege in attempting to keep out this doctor's testimony. The physician-patient privilege is statutory. We do not believe that the legislature intended that it should apply in workmen's compensation proceedings. Section 176.155, subd. 5, provides:

"Any physician designated by the commission, commissioner, or referee or whose services are furnished or paid for by the employer, who treats or who makes or is present at any examination of an injured employee, may be required to testify as to any knowledge acquired by him in the course of such treatment or examination relative to the injury or disability resulting therefrom."

It is our opinion that the commission was within its authority and discretion in calling Dr. Brainard and in receiving his testimony.

There seems to be adequate support in the record here, based on competent evidence, to sustain the commission's decision. It also appears that the injury to the employee's foot is well explained by the presence of arteriosclerosis obliterans.

In view of our decision on the merits, we need not consider whether employee's notice to employer was sufficient.

Affirmed.