## LOUIS GINSBERG AND ANOTHER v.
## PRATT'S EXPRESS COMPANY AND ANOTHER.

141 N. W. (2d) 511.

March 18, 1966—No. 39,828.

*Tyrrell, Jardine, Logan & O'Brien* and *Raymond W. Fitch,* for relator.
*Seltz, Cohn & Cohen* and *William Seltz,* for respondent Ginsberg.
*Mitchell R. Spector,* for respondent Saliterman.

FRANK T. GALLAGHER, C.

Certiorari upon the relation of the employer and its insurer to review a decision of the Industrial Commission.

Employee, Louis Ginsberg, was 68 years old at the time of the accident on October 30, 1959, and almost 73 at the time of the hearing before the referee for the Industrial Commission in April 1964. He had been employed by Pratt's Express Company or its predecessor since 1907. At the time of the accident, and for at least 25 years prior thereto, he worked as general manager and superintendent of its heavy hauling and machinery moving department. In carrying out his duties he drove an automobile, checked up on jobs, appraised them, figured the strength of buildings to ascertain if they would take certain loads, and did "lots of climbing" using ladders.

Mr. Ginsberg testified that at about 10 o'clock on the morning of Friday, October 30, 1959, while he was on his way to a church to check an installation of a heating boiler, he was involved in an automobile accident in which, when he stopped for a stop sign, his car was struck from the rear by another vehicle. He said that he was pushed "clean across the way" and next found himself between the curb and his car, "lying down on the street," with his clothes "all mussed up and dirty and filthy." He

said he was dazed and shaken up so badly that he couldn't "recall things" but picked himself up. He said the cars were considerably damaged but that he had no conversation with the other driver.

However, the latter said that when his car struck employee's, "it bounced his [employee's car] about two feet forward"; that the impact didn't do much damage to either of the cars; and that his own car "was dead right on the spot." He testified that after a few moments' hesitation employee drove his car across the intersection, pulled over to the side, parked, came back, "and started asking all kinds of questions." He also said that at no time did he observe employee lying on the street and that the first time the left front door on the employee's car came open was when he got out after the impact.

Employee drove home after the accident, washed, and applied some mercurochrome to his head and to some bruises on the left side of his face, which "was a little scuffed up." He went to bed, where he remained "practically all of the time" until the following Monday. He said that during that time he felt "just like in a trance and shaken and nervous." He said that he drove to work on Monday, November 2, but when he got as far as his office he "walked up about three steps," practically fell down, and was "all knocked out practically." Later he consulted Dr. Bernard I. Saliterman, who had been his physician before the accident, and complained of pain in his neck, right shoulder, right lower ribs, and lower back; numbness in the fingers of his right hand; and general pain. He returned to his home and went to bed.

The doctor's findings upon examination of employee disclosed a contusion in the left temple area, tenderness over the back of the neck, neck muscle spasm on moving his head, right trapezius muscle spasm, bilateral nystagmus in the eyes, decreased arm and leg reflexes on right side, and decreased circulation of the legs. His diagnosis was a whiplash injury to the neck; aggravation of preexisting hypertrophic arthritis of the lumbar spine and right sacroiliac joint; periosteal bruising of several ribs, with possible incomplete fracture; and a contusion of the left temporal area of the skull. He ordered strict bed rest, moist heat to the neck and lower back, and certain medications.

Employee stated that he remained away from work 2 or 3 weeks after

seeing the doctor, and then returned to work part time, but was unable to carry on his duties as he had before the accident. He claimed that he "felt very miserable," had headaches all the time, and had pains in his back and ribs. He continued to see his doctor and received lamp treatments, among other things. When asked how long he continued to work part time, he replied, "ever since I left the job."

He was hospitalized for further diagnosis and treatment from April 3 to 19, 1960, during which time he was seen by Drs. Saliterman (a general practitioner), Harold Berris (a neurologist), and Walter Indeck (an orthopedist). He returned to work on a part-time basis a few days later, and continued to see Dr. Saliterman and to receive therapy treatments.

The last day he worked was January 18, 1961, but he received full pay until April 30, 1961.

Employee was again hospitalized from May 2 to May 13, 1961, for therapy and examination, and was seen by Drs. Saliterman and Berris. In June of that year he was treated at his home by them for dizziness and imbalance.

Dr. Indeck first examined employee on April 4, 1960. He diagnosed a strain to the cervical and lumbar spine and prescribed treatment and medication for employee's back and neck. He saw employee again in March 1961 and in May 1963, and his diagnosis was substantially the same each time. It was his opinion that employee had some preexisting disability in his back prior to the October 1959 accident, and that the accident aggravated preexisting osteoarthritis; also that he had a 30-percent partial permanent disability of the back which he divided into a 15-percent partial permanent disability of the neck and 15-percent partial permanent disability of the lower back. He said that the last time he saw the employee his "disabilities would have no real hindrance in respect to part-time or light work."

Dr. Berris testified that he had known employee socially for several years before the 1959 accident and that he was vigorous and gave the impression of strength. He first examined employee at the hospital on April 4, 1960. His diagnosis was an injury to the back and neck superimposed on osteoarthritis, and injury to the vertebral artery. He continued to see employee from time to time, and examined him again April

2, 1964, before the hearing. It was his opinion then that the neurological difficulties employee was experiencing arose from the 1959 accident and that as a result employee was permanently totally disabled.

The medical experts called by the employer and insurer expressed contrary opinions. Dr. Frank Babb, an orthopedist, examined the employee March 23, 1964, almost 4½ years after the accident. Based on his examination, the medical history of the employee, and a review of X rays, it was his opinion that his findings and the complaints employee had when he examined him "were no longer attributable to the accident described but were, in fact, attributable to other and unrelated conditions."

Dr. Orley W. Foster examined employee but once, on August 31, 1961. It was his opinion that employee's complaints on that date were not attributable to the accident of October 1959. Dr. Andrew J. Leemhuis, who also examined the employee but once, on August 31, 1961, was also of the opinion that the effects of the accident were no longer present at the time of his examination and that employee's complaints were not related to the accident but to other diseases and processes.

The referee determined that on October 30, 1959, employee sustained a personal injury arising out of and in the course of his employment; that following his injury he was partially disabled, and worked intermittently and continued to receive his regular wage until April 30, 1961; that as a result of his injury he became temporarily totally disabled on May 1, 1961, and continued to be so disabled to the date of the hearing, April 10, 1964, a period totaling 153⅘ weeks; and that he is permanently and totally disabled. The referee also found that the reasonable value of Dr. Saliterman's services was $655 [1] and that employee would require further medical care.

Employee was awarded compensation for temporary total disability for 153⅘ weeks, amounting to $6,921; "compensation thereafter during

---

[1] In connection with Dr. Saliterman's fee, the referee made the following memorandum:

"I have seen fit to reduce the doctor's bill for services rendered to one half of the amount set forth in his bill * * * and feel that the allowance is fair and reasonable under the circumstances."

his permanent total disability"; and payment of medical expense including the amount determined to be due Dr. Saliterman. Relators were also ordered to furnish "such further medical care as may reasonably be required in order to cure and relieve from said personal injury."

Relators appealed to the Industrial Commission from the findings of the referee and specifically the determination that employee was disabled for 153⅘ weeks and that he is permanently and totally disabled. Dr. Saliterman also petitioned the commission to allow further testimony before the referee on the reasonableness of his services, submitting an affidavit in support of the petition.

On January 14, 1965, the commission in a two-to-one decision affirmed the referee's decision except that part pertaining to Dr. Saliterman's fees. At the same time it appointed the Hennepin County Medical Association as experts, under Minn. St. 176.391, subd. 2, to study the medical treatment rendered employee by Dr. Saliterman and to recommend the reasonable value of his services.

The majority opinion, written by Commissioner James Pomush, pointed out that employee was an active, healthy, and hard-working man until the accident of October 30, 1959; that from then on, with a short period of apparent improvement, "he continually went down hill" in his health and became unable to work; and that there was no reason to doubt the employee's word as to how the accident occurred or its severity. The majority felt that the weight of the medical evidence on behalf of employee was clear. It found nothing speculative in Dr. Saliterman's diagnosis that employee's condition was due to a whiplash which aggravated any preexisting arthritis, nor in Dr. Berris' testimony that employee had suffered permanent brain damage, could not do sustained work, and was permanently totally disabled. Although the doctors called by relators stated that at the dates of their examinations the complaints of employee were not attributable to the 1959 accident, the majority opinion noted that some of these doctors "were willing to admit the accident could have aggravated the pre-existing arthritis" and held that the evidence was clear that "the injuries were severe, apparently permanent, and has rendered a prior vigorous man permanently totally disabled."

Commissioner A. E. Ramberg dissented, reasoning that, in light of the

history of the injury, the contemporary diagnosis, and the age of the employee, the weight of expert medical opinion negates a finding of causal relationship. He concluded that employee's injuries caused temporary aggravation, but that "the disability he suffers is due to the pre-existing degenerative diseases."

Relators assign as error on appeal:

(1) That the Industrial Commission erred in ignoring the fact issue of whether the injury in question is a material permanent aggravation substantially creating the employee's difficulty, and in concluding, as a matter of law, that the accident "resulted" in disability without such a finding of fact.

(2) That it erred in delegating its factfinding function with respect to Dr. Saliterman's fees to a medical commission.

■ Relators argue that the commission's decision failed to make a finding of fact on the primary issue of the case, namely, whether the 1959 accident is a material permanent aggravation of the employee's progressive diseases. They contend that the commission's conclusion of law that the 1959 accident caused the employee's disability after April 30, 1961, must be distinguished from the fact issue in dispute here. It is their claim that the accident caused nothing because employee's arterio-sclerosis and hypertrophic arthritis had been present for many years. Therefore, they argue, the findings that employee became temporarily totally disabled and temporarily permanently disabled do not constitute adequate findings to satisfy the requirements of Minn. St. 176.371 with respect to factfinding. That statute provides that the commission, or the referee to whom a claim petition has been assigned for hearing, shall hear all competent evidence and as soon after the hearing as possible make such findings of fact, conclusions of law, and award or disallowance of compensation or other order as the pleadings and evidence require.

Relators cite Gagne v. Oreck, 266 Minn. 1, 122 N. W. (2d) 589, in support of their argument. In that case the employee, a tavern manager, claimed that he sustained a compensable personal injury in that he "was assaulted while carrying out regular functions of his employment." 266

Minn. 2, 122 N. W. (2d) 590. He had accompanied a woman customer to her car because he thought her too intoxicated to drive home, and the assault occurred when he got into her car for the purpose, he claimed, of driving her home. It was established that the employee's duties included caring for intoxicated persons about to leave the premises for the apparent purpose of driving home, so if the assault occurred as the employee claimed he was entitled to compensation. However, the woman testified that just before the assault the employee had kissed her several times. Neither the referee nor the commission made a specific finding of fact on the nature of the employee's conduct when he was assaulted. Consequently, we held that because of the lack of a finding on that issue of fact, determinative of the appeal, the case should be remanded to the commission for its decision as to whether the employee was assaulted because he was assisting the woman to get home safely, in furtherance of his employer's business, or because he was "in pursuit of amour," a personal mission. 266 Minn. 5, 122 N. W. (2d) 592.

We do not consider that case controlling. Here, there is no dispute that whatever compensable injuries employee received on the day of the accident, they arose out of and during the course of his employment. There is also evidence from which the commission could find that employee received injuries at the time of the accident; that he was vigorous and healthy and able to perform his work prior thereto; and that as a result of the accident he became permanently totally disabled. Employee said that before the accident the general condition of his health was very good and he was able to work every day. In 1949 he had slipped on some ice, received a slight cut near his shoulder blade, and had been in the hospital for a week for examination and treatment. He said he never had any trouble as a result of the accident and went back to work as usual after his release from the hospital. He also said that in 1955 he accidentally slipped, injured his shoulder a little, again went to the hospital, stayed there about a week, and after a few more days' rest at home, returned to his work and "had no trouble." He described the condition of his health from 1956 until October 30, 1959, as "[o]kay as far as I know." He claimed that during those years he had no pain in his neck, back, or head, no dizziness or difficulty in walking, and that his health

was very good. According to employee most of his physical troubles commenced after the 1959 accident.

We are confronted here with conflict in the medical testimony with respect to the effect of the accident on employee's physical condition. The existence of a causal relationship between an alleged work-related injury and the disability for which compensation is sought is ordinarily a fact question, and if reasonable inferences can be drawn either way the facts found by the commission must stand. Danussi v. Easy Wash, Inc. 270 Minn. 465, 134 N. W. (2d) 138; Zappa v. Charles Mfg. Co. 260 Minn. 217, 109 N. W. (2d) 420, 46 Minn. L. Rev. 211. The commission's determination of a fact question will not be disturbed on appeal unless it is manifestly contrary to the evidence. Schwerzler v. Frankamp, 255 Minn. 95, 95 N. W. (2d) 503. The duty of weighing the testimony and drawing inferences therefrom was that of the commission. This court on appeal cannot substitute its judgment for that of the commission. Luthens v. Glencoe Red & White Store, 264 Minn. 26, 117 N. W. (2d) 386.

A conflict in the opinions of medical experts, the same as a conflict in the testimony of other witnesses, must be resolved by the commission, the triers of fact. Luthens v. Glencoe Red & White Store, *supra;* Anderson v. Armour & Co. 257 Minn. 281, 101 N. W. (2d) 435; 7 Dunnell, Dig. (3 ed.) § 3334. Triers of fact in workmen's compensation proceedings must choose, not only between conflicting evidence but also between opposed inferences. Engel v. Starry, 268 Minn. 252, 128 N. W. (2d) 874.

It is our opinion that under the rules set out in the cases cited above no reversible error exists in connection with relators' first assignment of error, and on that issue the commission is affirmed. Employee-respondent is allowed $250 attorney's fees and his costs and disbursements in this court.

■  Relators contend that the commission delegated its factfinding function to a medical group for purposes other than those permitted by Minn. St. 176.391, subd. 2, which provides:

"The commission, or a commissioner or referee who acts with the consent of the commission, may appoint one or more impartial physicians or

surgeons to examine the injury of the employee and report thereon. Where necessary to determine the facts, the services of other experts may also be employed."

The commission referred Dr. Saliterman's bill to the Hennepin County Medical Association under this provision solely to determine the reasonable value of his services.

The record contains an itemized statement of Dr. Saliterman's bill for $1,310 and his explanation of it, based on his practice as a general practitioner. Dr. Saliterman testified that for the most part he had been charging $10 for each hospital and office visit, and that he made some charges of $15 for such visits when he spent "a lot of time" checking for new findings or giving treatments, etc. Summarizing his general charges in that connection, he mentioned $15 a visit for time running from 45 minutes to an hour, $10 for 30 to 35 minutes, and $5 for 5 to 10 minutes. He said that his usual charge for a visit to a patient in a hospital is $10. When asked how many patients he has in a hospital at any one time, he answered, "Five, six, ten * * *. It can vary. It can be only one." He also explained that "it takes me one hour just the time driving to the hospital."

Dr. Babb, the orthopedist called by relators, testified that the charge in his office for routine, but not all, office calls or hospital visits is $5 "and we make this charge in the belief that it is fair and reasonable and in keeping with what the average physician charges in this community." He said this is true of his specialized practice. It was his belief that in some specialties it would be considered permissible to charge more than a general practitioner.

Following the commission's order, a three-member special review committee of the Hennepin County Medical Society studied Dr. Saliterman's fees and interrogated him concerning them. It then recommended that the Industrial Commission authorize the payment of fees in the sum of $1,310 for the period from January 12, 1960, to March 21, 1964. It determined that employee was under the continuing care of his doctor from the date of his initial treatment, November 3, 1959, to March 21, 1964, and that the doctor had been conservative, prudent, and effective in his management of the case.

It is our opinion, under the facts and circumstances here, that the referral of Dr. Saliterman's bill to the Hennepin County Medical Association constituted an unlawful delegation of the factfinding function of the commission. It appears to us that there was sufficient evidence in the record on which the commission as trier of facts could affirm or reverse the referee's 50-percent reduction of the bill.

The commission in its order appointing the medical association as experts under § 176.391, subd. 2, requested it to make a study of the medical treatment rendered by the doctor, "taking into consideration the needed extent of any such treatment, and  * * *  make a recommendation in triplicate and in detail, as to what the reasonable value of said doctor's services * * * should be." It appears to us, however, that the purpose of § 176.391, subd. 2, was primarily to permit the appointment of "one or more impartial physicians or surgeons to examine the *injury* of the employee and report thereon." (Italics supplied.) While it might be argued by some far stretch of statutory construction that an employee might feel "injured" when he learned the amount of his doctor's bill, we do not think that the legislature intended that in such an event the commission could refer the bill to fellow doctors for evaluation through appointing "impartial physicians or surgeons." With all due respect to that much-needed and outstanding profession, we can visualize extreme conflicts between its members on the diagnosis of injuries, but not concerning fees.

In Swider v. Pillsbury Mills, Inc. 231 Minn. 210, 42 N. W. (2d) 560, involving a statute similar to this, the commission of its own motion appointed a neutral physician to make an examination of the injured person and report his findings to the commission. The order appointing him provided that the neutral physician was to be furnished a copy of the transcript of the evidence taken before the referee, together with the X-ray and cardiogram exhibits, and that after his examination the doctor was to give the commission his opinion on certain questions. We held that statute did not authorize the commission to submit the transcript to the appointed physician or to obtain any report other than his examination of the injured person.

We therefore hold that it was error to submit the doctor's bill to the

medical association. We also hold that there was evidence to sustain the referee's finding as to the amount awarded for the doctor's services.

Affirmed in part and reversed in part.