Kathleen Sharpe O'ROURKE, Widow of Leo Francis O'Rourke, Deceased, Respondent,

v.

NORTH STAR CHEMICALS, INC., et al., Relators.

No. 48512.

Supreme Court of Minnesota.

June 22, 1979.

Ronald O. W. Ylitalo, St. Paul, for relators.

Richard C. Smith, Minneapolis, for respondent.

Considered and decided by the court without oral argument.

SHERAN, Chief Justice.

The employer and insurer in this compensation proceeding sought review of an award of compensation to the dependents of employee Leo Francis O'Rourke, contending that the evidence does not support the finding that employee's death resulted from a personal injury which arouse out of his employment.[1] We affirm.

---

1. The finding that it occurred while employee was in the course of his employment is not challenged.

Employee worked the shift from 3 to 11 p. m. in employer's chemical plant. On December 1, 1971, he was removing bauxite, a dry granular material, from a hopper boxcar to a building on the employer's premises by means of a vacuum system attached to the bottom of the car. Shortly before 9 o'clock Charles Langenfeld, employee's superior, told him to take a coffee break. When he did not come to the office, Larry Krey, another worker, told Langenfeld that he had seen employee on top of the boxcar. Langenfeld went out, climbed to the roof of the boxcar, and looked into it through an opened vent in the roof. He did not see employee and returned to the office. Not finding employee there, he returned, searched the area around the boxcar, and, on looking into it again, discerned employee, who was covered with dust, lying face down in an area from which the bauxite had been removed. Approximately 20 minutes had elapsed between the time employee was last seen and the time he was found. He did not respond when called, so Langenfeld summoned aid from other employees. The boxcar was 10 feet deep, and the removal of employee from it was difficult, taking at least several minutes. During that time employee made no sound or movement. Attempts to resuscitate him were unsuccessful and he was taken to a hospital where he was pronounced dead on arrival.

An autopsy was performed the following day by Dr. Aldridge Johnson, an experienced pathologist. The autopsy revealed a small cut on employee's head but no other external injuries; distended veins in his neck; bauxite in his mouth, nostrils, pharynx, larynx, trachea, and main bronchi, where it was mixed with mucoid material; an acute subarachnoid hemorrhage of an estimated 300 cm. of blood, apparently originating in the left middle cerebral artery and extending over the base of the brain, upward over the lateral side of the brain, downward over the brain stem, and covering the cerebellum; acute congestion in the liver, spleen, and kidneys; and acute congestion in the lungs with areas of electasis (collapse of air-containing cells) and emphysema.

Dr. Johnson expressed the opinion that employee had died from asphyxiation caused by inhalation of the bauxite. The witness said that he thought employee fell into the boxcar because the hemorrhage caused either a disturbance of his equilibrium or unconsciousness but that the bauxite caused suffocation. The witness said that death following a subarachnoid hemorrhage would occur a minimum of 6 to 12 hours after its occurrence and often would not happen for days; that the congestion in the lungs and other organs is typical of asphyxiation; and that in his opinion the hemorrhage had not involved the brain center controlling respiration, which is in the medulla (brain stem). The autopsy had revealed nothing significant about that area.

Dr. John Fee, a specialist in internal medicine with considerable experience in pathology, expressed the opinion employee died from complications of the subarachnoid hemorrhage and that his work environment was not a contributing factor to his death. Dr. Fee said that the pressure and edema which result from the hemorrhage push the brain stem downward through the foramen nagmum (the hole in the base of the skull), injuring the center controlling respiration and thus interfering with and finally causing breathing to stop. Dr. Fee agreed that the hemorrhage had probably caused employee to fall into the boxcar. He felt that employee might have taken a few terminal breaths when he landed in the bauxite but that he did not die of asphyxiation because there was no bauxite in the more peripheral recesses of the lungs and the autopsy did not show that the bronchi were occluded by the matter in them. The witness said the mixture of mucus with the bauxite was characteristic of respiratory difficulty and that congestion in the lungs was a characteristic finding associated with cessation of respiration whether caused by asphyxiation or arrest secondary to the hemorrhage. He also testified that he would expect death to occur when a person suffers a hemorrhage permitting 300 cm. of blood to escape, but admitted that a small percentage of victims survive if an airway

is established or some other resuscitative technique is used and that the chance of survival is gone if resuscitative devices are not available because of the victim's position or location.

The Workers' Compensation Court of Appeals, after weighing this evidence, adopted the compensation judge's findings that the hemorrhage had caused employee to fall into the boxcar, that the fall caused his death by asphyxiation, and that he thus sustained an injury which arose out of his employment and resulted in his death. Our review of the record shows that the findings have support in the evidence and the permissible inferences therefrom. That employee fell into the car is reasonably inferred from the evidence that he was last seen on its roof and by the doctors' opinions that the hemorrhage caused him to lose consciousness or equilibrium. Although relators argue here that employee did not fall into a place where he could not obtain air because of the fact that there was no bauxite in the area in which he was found, it can reasonably be inferred that the area contained bauxite when he fell from the facts that the bauxite was still being suctioned from the car when he was found, that 20 minutes or more had elapsed since he had last been seen, that Langenfeld had looked into the boxcar once without discovering him, that he was covered with dust when found, and that he had a substantial amount of bauxite in his mouth, nostrils, and respiratory system.

The evidence permitting the inference that employee fell into the boxcar also compels the inference that his fall itself was caused by an idiopahtic condition not shown to have had any relation to his employment. It is generally agreed, however, that if an employee who falls because of such a condition is placed by his employment in a position which aggravates the effects of the fall, resultant injury and death are causally related to and arise out of his employment. See, 1 Larson, Workmen's Compensation Law, §§ 12.10 to 12.14. Thus, if employee's death was caused by suffocation and the inability to obtain prompt resuscitative measures, because of his employment conditions, it arose out of his employment. See, *Bethlehem Steel Co. v. Jones,* 222 Md. 54, 158 A.2d 621 (1960).

The crucial issue is, therefore, what caused employee's death. Resolution of the conflicting opinions of the medical experts on that question was for the court of appeals as the trier of fact. *Dauphine v. City of Minneapolis, Dept. of Public Welfare,* 249 N.W.2d 463 (Minn.1977); *Grabowski v. Great Northern Oil Co.,* 283 Minn. 205, 167 N.W.2d 14 (1969). Whether employee was asphyxiated and there was therefore a causal relation between his employment and his death was a fact question on which reasonable inferences could be drawn either way. Thus, the finding adopting Dr. Johnson's opinion as to the cause of death and the consequent finding that employee's death arose out of his employment must be affirmed. *Stotz v. Sabin Brothers,* 257 N.W.2d 359 (Minn.1977); *Ginsberg v. Pratt's Express Co.,* 273 Minn. 345, 141 N.W.2d 511 (1966).

Respondents are allowed $350 attorneys fees.

Affirmed.

OTIS, Justice (dissenting).

I agree that the evidence is sufficient to support the inference drawn by the compensation judge that Mr. O'Rourke suffocated from inhaling the bauxite and that the victim's death was thereby hastened. But the record clearly does not support the conclusion that the employee would not have died very shortly had he not fallen into the bauxite. Dr. Johnson testified that the employee did not immediately die from his cerebral hemorrhage, and explained:

"Subarachnoid hemorrhages do not kill that fast. It takes a minimum of six to twelve hours and generally it takes days before a subarachnoid hemorrhage kills anybody, regardless of size.

\* \* \* \* \* \*

" \* \* \* The subarachnoid hemorrhage was extensive enough, I believe, that in due time it probably would have

caused unconsciousness, but I cannot say that it was extensive enough to have caused death."

Dr. Fee, also experienced in pathology, conceded that a "very small percentage" have a chance of surviving a subarachnoid hemorrhage with proper emergency care. However, he testified with respect to this victim's prognosis:

" * * * Prognosis with this much bleeding the prognosis would be very poor. Almost a hundred per cent mortality. Hundred per cent lack of—of—of being enough brain function left to sustain life, no matter what we did. *Some of them do recover, but not with this much hemorrhage."* (Italics supplied.)

Dr. Fee explained that surgery was so unsuccessful it was rarely undertaken, and that a hemorrhage as massive as Mr. O'Rourke's usually causes ·complications from which the brain ultimately dies. In response to the court's inquiry concerning the length of time until death occurs, where no measures are available to support respiration and heartbeat, Dr. Fee answered:

" * * * [I]f you can restore ventilation, the heart will go on because the heart hasn't been damaged. * * * If you can restore respirations, this man could not have survived. He wouldn't have survived because of the extent of the hemorrhage anyway, but the only way he could survive any longer was to institute resuscitative measures[.] * * I think it's of academic interest. He wouldn't have made it either way. If he had had it on the ground and somebody knew how to do it, with this much hemorrhage he would have died in the hospital."

Although Dr. Johnson testified that victims of subarachnoid hemorrhage "sometimes" survive, he had never known anyone to survive. He had no opinion as to whether it would have caused Mr. O'Rourke's death, but neither he or any other witness disputed Dr. Fee's testimony with respect to the usual progression in such cases. To hold under such circumstances that as a matter of fact Mr. O'Rourke would have

survived but for his fall is in my opinion contrary to all logic, reason, and experience.

I would reverse.